## WILLIAM L. KENNER

*v.*

## CHARLES N. HARDING.

1. WARRANTY ON SALE OF PERSONAL PROPERTY—*what constitutes.* If the vendor of a chattel assumes to assert a fact of which the buyer is ignorant, and upon which he relies, it will amount to a warranty; but if the vendor merely states an opinion or judgment upon a matter of which he has no special knowledge, and on which the buyer may be expected, also, to have an opinion and to exercise a judgment, there will be no warranty.

2. SAME—*when extended to visible defects.* The general rule, that a warranty does not protect against defects that are plain and obvious to the senses of the purchaser, and which require no skill to detect, has no application to a case where the vendor uses art to conceal, and does conceal, such defects.

3. Where the vendor of a mare and a mule had them both in a single stall, where defects were not easily discoverable when the buyer called to examine them, and, when about to examine, remarked that the mule had kicked on a prior occasion, and assured the buyer that the mule was sound, and the latter, being inexperienced, made the purchase relying on the assurance given, it was *held,* that this was a warranty of soundness, which extended to visible defects.

4. SAME—*of soundness, construed.* A warranty of soundness in a horse or mule sold amounts to a warranty against any defects which render it not capable of immediate use put to any fair work the owner may choose. If, at the time of the sale, the animal has any disease, which either diminishes its actual usefulness, so as to make it less capable of work of any description, or which, in its ordinary progress, will diminish its natural usefulness, it is unsound.

5. FRAUD—*representations and conspiracy to defraud.* The general rule, that the mere statements of the vendor as to the value of land, or what he has been offered for it by others, are not, of themselves, evidence of legal fraud to justify a recovery against him by the purchaser, has no application where the purchase is induced by the false representations to the same effect by a third person, effected by a conspiracy between him and the vendor.

6. Where the vendor of land represented to a purchaser, who was unacquainted with the value of the land he bought, that he had been offered $1200 for the same by a certain person, and procured such person to make the same statement to the purchaser, whereby he was induced to buy, and it appeared the offer was a mere pretense, and payable in worthless notes and other property greatly in excess of its value, it was *held,* that the vendor was liable to the vendee in an action for the fraud and deceit.

APPEAL from the Circuit Court of McDonough county; the Hon. C. L. HIGBEE, Judge, presiding.

This was an action on the case, brought by Harding against Kenner, in the circuit court of McDonough county. A trial resulted in a verdict and judgment in favor of the plaintiff, whereupon the defendant appealed.

Mr. C. F. WHEAT, for the appellant.

Messrs. TUNNICLIFF & MATTESON, and Mr. WM. H. NEECE, for the appellee.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

It is averred, in the fourth count of the declaration, that the defendant bargained with the plaintiff to sell to him a certain mule and two mares, and that, to induce the plaintiff to buy them, and with the intent to deceive, cheat and defraud the plaintiff in their purchase, the defendant falsely, fraudulently and deceitfully represented and stated to the plaintiff that the

mule and mares were all sound and right, except that one of
the mares had had a slight touch of the "sweaney;" and
plaintiff, confiding in and relying upon said representations
and statements of the defendant, purchased the said mares
and mule, etc., and paid him, etc. After alleging a breach of
the warranty in respect of the mule, by reason of its being
weak and lame in its pastern joints, which, it is alleged, was
well known to the defendant, the declaration proceeds as fol-
lows: "And said plaintiff avers that said defendant,     *    *
to deceive said plaintiff and prevent him from discovering the
same, had said mule, at the time said plaintiff came to see
or bargain for said mule, placed in a stall in said defendant's
barn, with another horse, and in such a way that said plaintiff
could not readily, and did not at all, discover or know of said
unsoundness or lameness until after the consummation of said
purchase, and, to prevent said plaintiff from any close inspec-
tion of said mule, and, by a possibility, discovering said
unsoundness and lameness, he, the defendant, stated to said
plaintiff, as said plaintiff approached the stall where said mule
stood, for the purpose of examining the same, that said mule
sometimes kicked, but that said plaintiff could rely upon said
mule and mares being all sound, except that one of said mares
had had a slight touch of the sweaney,—both and all of which
said statements of said defendant were false, and known by said
defendant to be so at the time he made the same, and were
made use of by said defendant as an artifice to, and did in
fact, deceive and mislead said plaintiff, and prevent his further
examination of said mule to discover whether or not he was
sound; and the plaintiff saith that the said defendant, by
means of the premises, on the day and year aforesaid, at the
county aforesaid, falsely and fraudulently deceived the said
plaintiff in the said sale of said mule, and thereby greatly
wronged, injured and damaged him, the said plaintiff."

Plaintiff testifies: "I told Mr. Kenner, before the trade,
at Johnson's store, that I was no judge of the mare or mule,
and would rely upon what he told me about them; that I did
not want to trade for property that I could not convert into

money to pay my debts. A few days before the trade was made, myself and son, George, went out to Mr. Kenner's place to see the stock. The mare and mule stood in one stall, at the south-east corner of the barn, their heads to the west, and the mare on the south side of the mule. As we went into the barn, going towards the mare and mule, I told my son he must look out, for I had heard that mules were handy with their legs. Kenner said the mule had kicked when they were trimming his tail. I asked Kenner if the mare and mule were sound. He said I could rely upon it that they, the mare and mule, were all sound and right, except that the mare had had a slight touch of the sweaney, but had measurably recovered. The mule stood nearest me as I went towards them. I did not see any imperfection or unsoundness in the mule. There was some straw and manure on the floor under them. I did not go into the stall. Mr. Kenner did not tell me that the mule's feet needed trimming, and that its ankles were imperfect. Mr. Kenner told me the stock was all sound and right when we went into the barn, and afterwards, and before the trade, he told me the same thing in Johnson's store. I relied upon what he said about the stock, believing him to be an honest man. I have had no experience in trading in or handling stock before the trade was consummated."

George Harding, the son of the plaintiff, confirms him, in his evidence, as to the position the mule occupied when they examined it, the remark about its having kicked when its tail was being sheared, and what the defendant said in respect to the soundness of the mule and the mare.

The defendant, in his evidence, materially contradicted the evidence of the plaintiff; but it was the province of the jury to determine to whom to give the greater credit, and on which side was the preponderance, and we do not feel authorized to say the evidence does not sustain the plaintiff's version of the contract.

The mule's hind pastern joints were, at the time, crooked over, and the evidence was ample to satisfy the jury that it was, in that respect, lame and unsound.

Many of the witnesses think, by reason of this defective condition, the mule was of no value whatever, while others think that it might be cured, and the defect was not such as permanently to injure its value.

Appellant insists, first, that there was no warranty, and secondly, that, if there was a warranty, it was only of soundness, and did not embrace the defect in the hind pastern joints.

In determining whether there was in fact a warranty, the decisive test is, whether the vendor assumes to assert a *fact* of which the buyer is ignorant, or merely states an opinion or judgment upon a matter of which the vendor has no special knowledge, and on which the buyer may be expected, also, to have an opinion and to exercise his judgment. In the former case, there is a warranty; in the latter, not. Benjamin on Sales, 454. And this is substantially the rule recognized by this court in *Adams* v. *Johnson*, 15 Ill. 345.

Although the general rule is, that a warranty will not extend to guard against defects that are plain and obvious to the senses of the purchaser, and which require no skill to detect them, this has no application to cases where the vendor uses art to conceal, and does conceal, such defects. *Chadsey* v. *Greene*, 24 Connecticut, 562; *Robertson* v. *Clarkson*, 9 B. Monroe, 507; *Grant* v. *Shelton*, 3 id. 423; *Irving* v. *Thomas*, 6 Shepley, (18 Me.) 414. See, also, *Kohl* v. *Lindley*, 39 Ill. p. 201.

The having the mare and mule in the stable, instead of out in the yard where the defect would have been plainly visible, and in a single stall, too, and with litter about their legs, in connection with the remark about the mule having kicked, has the appearance of design to prevent the discovery by the plaintiff of the defect, and, in view of the plaintiff's known inexperience in regard to handling such animals, we think the jury were justified in finding that it was done to deceive him and prevent his discovering the defect.

Waiving this, however, the mare and mule were in the same stall, whether placed there for the purpose of misleading the

plaintiff or not, and it is evident the defendant knew the plaintiff had not discovered the defect in the mule's limbs, and when informed, as he was, that the plaintiff was relying upon his word, and not upon his own judgment, it was plainly his duty, if he did not intend to contract that the animals were as he represented, to notify him of the fact, and that he must be his own judge. Not having done so, he should be held to make good his representations. The representation was, that the animals were sound and all right, with the exception of the slight touch of sweaney that one of the mares had, and this is the undertaking, to which he must be held.

In *Kiddell* v. *Burnard*, 6 Meeson and Welsby, 668, which was an action for a breach of warranty of the soundness of three bullocks, PARK, B., in discussing the meaning of the term, "sound," in that connection, said: "The rule I laid down in *Coates* v. *Stevens* (2 M. and Rob. 137) is correctly reported; and I am there stated to have said: 'I have always considered that a man who buys a horse warranted sound, must be taken as buying him for immediate use, and has a right to expect one capable of that use, and of being immediately put to any fair work the owner chooses. The rule as to unsoundness is, that, if at the time of sale the horse has any disease, which either actually does diminish the actual usefulness of the animal, so as to make him less capable of work of any description, or which, in its ordinary progress, will diminish the natural usefulness of the animal; or, if the horse has, either from disease or accident, undergone any alteration of structure, that either actually does at the time, or in its ordinary effects will, diminish the natural usefulness of the horse, such horse is unsound.'"

This would seem to be a sufficiently correct definition of the term, and, applying it here, it is very clear there was a breach of the warranty. Either from disease or accident, the mule's hind pastern joints were so crooked over that it was lame and less capable of work of every description than it would have been in its natural state, and it appears this must permanently impair its usefulness.

The sixth count of the declaration is as follows:

" And also for that, whereas, heretofore, to-wit: on the first day of January, A. D. 1874, at and within the county of McDonough, aforesaid, the said plaintiff bargained with the said defendant to buy of him, in exchange for other property of plaintiff, a certain other parcel of land of said defendant, known and described as the south-east quarter of the north-west quarter of section twenty-one (21), in township five (5) north, in range three (3) west, and situate, lying and being in said county of McDonough; and said plaintiff, in purchasing said lands, as aforesaid, from said defendant, was desirous of doing so for the sole purpose of selling the same again in the market, or exchanging the same again for other property, at or about the reasonable market value of said lands so being then and there bargained for of said defendant, and which the defendant well knew; and said plaintiff avers that he was ignorant of the condition or value of said land, or of other similar land in the neighborhood where the land aforesaid was situated, and had never seen nor been informed of the market value of said land of said defendant, and was residing and doing business a long distance, to-wit: seven miles from said land; and said defendant, then and there well knowing the premises and the facts aforesaid, and also then and there well knowing that said land was of little or no value, to-wit: not exceeding in value the sum of four hundred dollars, and then and there craftily and subtilely intending to cheat, deceive and defraud said plaintiff in the sale of said land to him as aforesaid, then and there falsely, fraudulently and deceitfully affirmed, stated and represented to said plaintiff that said land was worth the sum of twelve hundred dollars in the market, and that he, the defendant, had been offered, by one William Delay, who resided near and owned lands adjoining the said land of said defendant, and whom said plaintiff then and there believed to be a responsible and reputable man, the sum of twelve hundred dollars for said land, to-wit: four hundred dollars payable in four horses, and eight hundred dollars payable in promissory notes; but that he, the defendant, was then about to re-

move from his farm in the country into the city of Macomb, and could not, therefore, well handle said horses, and had therefore declined the offer of said Delay, but then and there, for the fraudulent purpose of throwing said plaintiff off his guard, and to prevent him from making further investigation as to the market value of said land, requested and advised said plaintiff to inquire of said Delay as to the market value of said land.

"And said plaintiff avers, that afterwards and during the pendency of said negotiations between said plaintiff and defendant in regard to the purchase of said land by plaintiff of said defendant, and before the consummation thereof, to-wit: on the day and year aforesaid, at the county aforesaid, and the said plaintiff being then and there wholly ignorant, and unsuspecting any fraud and conspiracy between said defendant and said Delay, to deceive, cheat and defraud said plaintiff in said purchase as hereinafter mentioned, he, the said Delay, called at the store where said plaintiff was then staying, and, as plaintiff avers, at the instigation of said defendant, and then and there, in answer to plaintiff's inquiries of him, the said Delay, concerning the market value of said land, and of his offer to purchase the same of said defendant, which said inquiries were made by plaintiff of said Delay, as requested by said defendant, as aforesaid, he, the said Delay, then and there falsely, fraudulently and deceitfully represented and stated to said plaintiff that he, said Delay, had recently offered to purchase said land of said defendant at the price, and for the sum of twelve hundred dollars, payable in four horses at one hundred dollars each, and the balance of said purchase money in promissory notes; and that said land was reasonably worth twelve hundred dollars in the market. And said plaintiff avers that, confiding in the said statements and representations of said defendant, and said Delay, so made, as aforesaid, and believing the same to be true, and made in good faith, he did then and there consummate said negotiations with said defendant, and buy of said defendant said lands, at said sum of twelve hundred dollars, and pay him therefor the price

aforesaid in other property, at its reasonable cash value, and reasonably worth more than the value of said lands; 'and said plaintiff in fact saith that the said representations of said defendant, as to the market value of said lands, and as to what he had been offered for the same by said Delay, were false and fraudulent, and known by said defendant to be so at the time he made the same, and were so made by said defendant to deceive, mislead and defraud said plaintiff. That said defendant had not been offered *bona fide* twelve hundred dollars by said Delay for said land; but on the contrary, said defendant, for the fraudulent purpose of deceiving and defrauding said plaintiff as to the market value of said land, and to give color to any statement he might make to said plaintiff as to his having been offered twelve hundred dollars for said land, had, before referring said plaintiff to said Delay, to inquire as to the market value of said land, as aforesaid, and before telling said plaintiff what said Delay had offered him therefor, as aforesaid, falsely, fraudulently and deceitfully conspired with said Delay to the effect that said Delay should offer said defendant twelve hundred dollars for said land, eight hundred of which was to be paid in promissory notes which said Delay then had against third parties, whose names are unknown to plaintiff, but the makers of which were then and still are insolvent, and said notes then and still are worthless, and at the time well known to be so by both said defendant and said Delay, and the other four hundred dollars payable in four horses which said Delay then and there had, but which were of little or no value, to-wit: not exceeding in value, altogether, the sum of two hundred dollars, at the time said pretended offer was made by said Delay to said defendant, as aforesaid, and which was then and there well known to said defendant, and it was at the time agreed and understood between said defendant and said Delay that said offer was a fictitious one, and should not and was not to be accepted by said defendant; and said plaintiff avers that the foregoing was the sole and only offer of twelve hundred dollars, or of any other sum near that amount, said Delay ever made to said defendant for said

land. And said plaintiff avers, that at the time of his making said bargain and purchase, he was wholly ignorant of the fraudulent combination and conspiracy between said defendant and Delay to deceive, cheat and defraud him in the purchase of said land, and of their false and fraudulent statements and representations in regard to the same, and was so situated that he could not personally examine said land and learn from other sources as to its market value, and was, by the said trick, fraud and artifice of said defendant, as aforesaid, kept from making further investigation in that behalf, but confided in, believed and relied upon said statements and representations, aforesaid, in that respect, all of which said defendant well knew to be false, deceitful and fraudulent at the time of the making of the same; and said plaintiff further said, that the said defendant, by means of the premises, on the day and year aforesaid, at the county aforesaid, falsely and fraudulently deceived the said plaintiff on said sale, and whereby said plaintiff has been greatly wronged, injured and damnified, to-wit: to the amount of one thousand dollars."

The fair preponderance of the evidence is, that the plaintiff was induced to take the land at a grossly exaggerated valuation, and the evidence, we think, sufficiently establishes the conspiracy here charged. Delay shows, that several years before the trade between plaintiff and defendant, and when the land was more valuable than it was at that time, defendant having since taken the timber off it, he offered to let him have it for $1000. He also says, that in the October preceding the trade, defendant came to his house, and said he wanted him to help him make a trade of the land with Mr. Knapp; that he was about to trade it to Knapp for his town property, and that Knapp was asking more for his property than it was worth, and that he was asking more for his land than he had been offering it for. He then adds: "I offered him $800 in cash notes and two horses. He said that was not enough. I then added two more horses to my offer. I just made the offer to help him." About a month after this, he communicated to the plaintiff the fact that he had made this offer to

18—85TH ILL.

the defendant. He further says: "Defendant afterwards requested me, if Knapp, Gloyd, Harding, or any one else, asked me about the land, he wanted me to stick to my offer. I told him that I was an old trader, and knew how to do that." Defendant also instructed the witness not to say that the notes were not good, and to hold out the idea that the land was worth $30 per acre.

The notes, in fact, were worthless, and the horses were worth, three of them, $70 each, and the other $35 only. It needs no argument to show that this offer of Delay was mere form, and so understood by both parties, to give a color of excuse for his subsequent conduct. It was but a part in a scheme to wilfully misrepresent and exaggerate the value of the property.

The general rule of law is, that the mere statements of the vendor as to the value of land, or what he has been offered by others for it, are not, of themselves, such evidence of legal fraud as will authorize a recovery, but that does not apply here, where the statement comes from a third party, unknown to have any interest in magnifying the value of the land. The plaintiff being, himself, uninformed as to the value of the land, was entitled to expect that he could get honest information from others, and was not to anticipate they were in a conspiracy with the defendant to deceive him. By this conspiracy, the defendant caused a source of information to which the plaintiff had a right to resort, and on which to rely, to become corrupted, and thereby prevented his obtaining correct information, and so the plaintiff was both morally and legally defrauded. The distinction is well stated in *Medbury et al.* v. *Watson*, 6 Pickering, 246. There, an action was brought against a third party for the false representations as to the value of a tannery, etc., upon the faith of which the plaintiff bought of the owner. But the fact that the suit here is against the owner, instead of the party making the false statements, since the conspiracy is clearly proved, does not render the principle governing the case less pertinent. The judge delivering the opinion of the court, among other things, said: "I do not think it necessary to go over, in detail, the authorities

cited by the counsel for the defendant, they having often been subject to comment; but I presume I am safe in affirming, that the greater part, if not all, the cases cited are those of false affirmation by the vendor to the vendee, where the maxim *caveat emptor* applies, and not those resting on the false representations of a third person with regard to the value of the property. And the distinction between the two cases is marked and obvious. In the one, the buyer is aware of his position; he is dealing with the owner of the property, whose aim is to secure a good price, and whose interest it is to put a high estimate upon his estate, and whose great object is to induce the purchaser to make the purchase; while in the other, the man who makes the false assertions has, apparently, no object to gain; he stands in the situation of a disinterested person, in the light of a friend, who has no motive or intention to depart from the truth, and who thus throws the vendee off his guard, and exposes him to be misled by the deceitful representations." And it was held the plaintiff was entitled to recover.

In a more recent case, in the same court, *Manning* v. *Albee*, 11 Allen, 524, a party who was induced to contract by false and fraudulent representations of a third party, that a particular kind of security, which was worthless, was selling in the market at a given price, accompanied by the exhibition of a newspaper containing false quotations thereof, was held entitled to rescind the contract.

Similar ruling was applied by the Supreme Court of Vermont, in *Adams* v. *Seule et al.* 33 Vermont, 538, where the owner of a lease employed another to greatly exaggerate its value to the landlord, and to agree to purchase the whole property of him at more than its value, if he would buy the lease from the owner, for the purpose of defrauding the landlord into a purchase of the lease; and it was held, such exaggerated statements of value could not be excused as mere "*puffing*," such as a vendor is allowed to make use of, and that the readiness with which the landlord caught at the bait, though he knew the price at which the other party proposed

to purchase was too high, did not excuse the fraud on the part of the confederates. *Bagshaw* v. *Seymour*, 18 C. B. 903, and *Bedford* v. *Bagshaw*, 4 H. and N. 538, are analogous in principle.

On authority, therefore, as well as on principle, we are of opinion that the plaintiff was entitled to recover on account of the false representations as to the value of the land, made by Delay pursuant to the defendant's request.

The jury were correctly instructed as to the law, and we see no error in any of the rulings of the court.

The judgment is affirmed.        *Judgment affirmed.*

Mr. JUSTICE BREESE: I am unable to concur in this opinion, and will give a few reasons why I do not, not having time to go fully into the examination of all the questions.

As to the first four counts, on an alleged warranty of the soundness of the mule, I am satisfied there should have been no recovery, on the long and well established principle that a warranty of soundness does not extend to things which, from the senses, may be readily discovered to be otherwise. This principle is as old as the common law. 2 Rolle's Abr. 5; 1 Salkeld's Reports, 211; *Dyer* v. *Hargrave*, 10 Vesey, 507; *Schuyler* v. *Ross*, 2 Caine's N. Y. Term Reports, 202. The proof is clear, the defects of the mule were plainly visible to a careless observer. Appellee, with his son, a young man grown, went to the stable to examine her, and without requiring her to be brought out and exposed to plain view, that she might be better seen, he traded for her. Had she been exposed to view, he could not have failed to see the great enlargement of her hoofs and the infirmity in the pastern joints—defects visible to every one. The court charged the jury, on this point, that the purchaser should use care and caution in · such a transaction, which was not done. Weeks elapsed whilst this trade was on hand. The parties were on equal grounds, and every opportunity was presented appellee to make a thorough examination of the property. The warranty did not cover blemishes

so visible as these were. Appellee did not use his faculties as the law requires. The distinction is, when the deceit may easily appear to the vendee, an action will not lie. No trick or unfair means was used to conceal the defects. The animal was in the stable, where it should have been. Common prudence on the part of the purchaser would have required that he should have insisted on the animal being led out and exposed to full view.

As to the land trade, no proof of confederacy or conspiracy with Delay is presented. Delay testified he was always willing to give the horses and notes for the land, and made the offer to appellee.

This court had occasion, at this term of the court, to examine the principles underlying this case, in *Tuck* v. *Downing*, in chancery, to cancel a note executed on the sale and conveyance of mineral land in Utah Territory, and the conclusion was reached, a court of equity would not relieve when a party had full opportunity to examine the property, and did examine it before he purchased.

From the earliest times it has been held, an action on the case for deceit does not lie on the false affirmation of the value of land or of jewels. 1 Com. Dig. title "Action upon the case for a deceit," 243, referring to 1 Siderfin, 146, 1 Levinz, 102, Yelverton, 20. Nor does it lie if one affirms he was offered so much by A for the thing sold, when he was not. Ibid.

The tract of land in question was in the near neighborhood of these parties, and could have been seen and examined by appellee in a few hours. When the proposition was made to Gloyd to buy at the same price, he had the good sense and caution to go and see the land, and judge for himself of its value. Appellee could have done the same, but he chose to rely on what the seller told him. This was his own folly. As was said by this court in *Miller* v. *Craig*, 36 Ill. 109, a party desiring to sell property, real or personal, has a right to extol the value of his own property to the highest point the credulity of his antagonist will bear, and depreciate that of the other party. This is the constant practice, and no one has

ever supposed such boastful assertions or highly exaggerated description amounted to fraudulent representation or deceit. And this court said, long anterior to this case, in *Sims* v. *Klein*, Breese, 234, that every false affirmation is not a fraud. *Eames* v. *Morgan*, 37 Ill. 260. This assertion as to value and the growth of timber on the land, must be held as mere matter of opinion, the correctness of which appellee could have satisfied himself by viewing the land, which was in convenient reach.

This case is wholly unlike that of *White* v. *Sutherland*, 64 Ill. 181. In that case the party complaining was bed-ridden —a cripple, incapable of motion. The lands negotiated for were some thirty miles distant from St. Louis, the place of his residence. The owner and vendor was a minister of the gospel, and had been an officer in the army, for whom the vendee sent to visit him, telling him he should rely upon his statements, and invoked him, as a minister of the gospel, as a gentleman and as a soldier, to tell him the exact truth, and he told him untruths, and known to be so. There was a trust and confidence reposed, which was justifiable under the circumstances, and the party was relieved in equity.

The evidence as to the value of this land is somewhat conflicting. It is not entirely clear it is not worth the price allowed in the trade. It is not unreasonable to presume that appellee was so much pleased in finding a purchaser for his property, which was incumbered by a lien for eight hundred dollars, which the purchaser assumed to pay, he did not care to examine what he was about to receive in exchange, very critically.

An examination of all the testimony satisfies me appellee did not make out a case. Courts of justice do not sit as guardians of men of mature age, to relieve them of hard bargains which it was their own folly to make.

I am satisfied plaintiff made out no case, and ought not to recover. The principles announced in the opinion of the court are, I think, contrary to the rulings of this court in similar cases.