Spear, J.
The questions arising on the record are: 1. Whether or not Coit is liable for the acts of Miller which produced the injury? 2. Whether or not the plaintiff’s damages,in case the jury found it' sustained damages, could embrace all the injury arising from the adulterated character of the milk delivered? 3. Tf not, whether in any view the true rule is that, in case the jury found that the milk was adultered by Miller maliciously, to injure Coit, and was without Coit’s knowledge, so delivered to the factory adulterated, plaintiff was entitled to a rebate for the water, so that Coit would be liable only for the amount of the water delivered, because it was not milk ?
The inquiry involves, primarily, a consideration of the liability of the master, although reduced to its last analysis, it is an inquiry as to the proper rule of damages. Upon the face of things it is apparent that the question regarded as the controlling one, is, whether or not Coit is in any way responsible for the acts of Miller. ,
Let us first consider what result would follow if the case made is the same as though the claimed injury had arisen from Coit’s own negligent act. What, under such circumstances, would be the proper rule?
The petition alleged a contract. It was in the nature of a proposal and acceptance, Coit proposing and ag'reeing’ to deliver at the factory milk, which should be milk of first quality, meaning, at the very least, milk not adulterated, and the com *404 pany assenting, and in consideration of the offer, impliedly, if not expressly, agreeing to receive and pay for such milk as should be delivered, the price of first quality milk. The acceptance of the milk so delivered was a sufficient consideration for Coit’s promise. It may be that, so far as the agreement was executory it was unilateral and, that had Coit failed to deliver any milk the company could not have recovered damages for such failure; but we need not be concerned with that consideration, for milk was delivered, and nothing can be clearer than that when Coit deliv ered he was bound by the terms of his accepted proposal. Benjamin on Sales, 51; The Great Northern Ry. Co. v. Witham, L. R. 9, C. P., 16
Inasmuch, therefore, as the evidence of plaintiff tended to sustain the allegations of the petition, the jury was justified in finding this contract. That is, a. contract by which Coit agreed to deliver milk of first class, or superior quality, i. e., pure milk and to further find that Coit had knowledge that the milk he delivered would be mixed with milk of other patrons, for the manufacture of butter and cheese in part, and in part skimmed for the cream, the product of which would be used by plaintiff in its business as caterers, etc.,'and in part sold in the market; and that the milk delivered was under this contract. Such a contract carries with it a warranty that the goods shall be, and are, what they are agreed to be, for no particular form of words is required to constitute a warranty. As held in Pasley v. Freeman, 3 T. R., 57: “An affirmation at the time of a sale is a warranty, provided it appear on evidence to have been so intended.” To which may be added, upon equally good authority, that “a positive affirmation of a material fact, intended *405 to be relied upon as such, and which, is so relied upon, constitutes in law a warranty, whether the vendor mentally intended to warrant or not; and that his intention is immaterial.” Am. Note to Benjamin on Sales, 6th Ed., 625; Hawkins v. Pemberton, 51 N. Y., 198; Reed v. Hastings, 61 Ill., 266; Kenner v. Harding, 85 Ill., 264. It is clearly sufficient if the declarations and agreement are so understood and acted upon by the parties; and, if made at the time of the sale, and as part of or inducement to the sale, as in this ease, no other consideration is necessary, the price to be paid being a sufficient consideration. Am. Note to Benjamin on Sales, 6th Ed., 622. The liability of Coit was as broad under a breach of this contract as though there had been an express warranty by him of every lot of milk as it was delivered. Moore v. King 64 Hun. 224. The proper rule of damages for a breach in such a case would be such damages as may fairly and reasonably be considered either as arising naturally from a breach, or what the parties might reasonably be supposed to have forseen, to have had in contemplation, when they entered into the con-. tract. The rule is that if the special circumstances under which a contract is actually made are known to both parties, the damages resulting from the breach, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of such a contract under the special circumstances. Hadley v. Baxendale, 9 Ex., 341. Plaintiff and defendant, were both handling milk extensively, and it is but fair to assume that each knew the effect of mixing impure milk with that which was pure, and the consequent result to the product. So they may be reasonably held to have had such damage in con *406 templation when they contracted, in case of breach. Probably, also, an- implied warranty would be presumed, in view of the knowledge of the purpose, that the milk should be reasonably fit for that purpose; but this is not essential, nor is it important to pursue it at length, inasmuch as there was a contract.
Under breach of such a contract it is manifest that the vendee’s damage should be at least compensation, and if the mixture of the impure milk with that which was pure, and its use in the factory, resulting in impairing the value of the product, it is equally manifest that compensation could not be awarded without taking that fact into the account.
Cases illustrative of the point are numerous. Wilcox v. McCoy, 21 Ohio St., 655, was based upon a claim for damages arising from a sale of sheep represented to be sound but which were affected by a disease known as the foot rot, whereby other sheep of the plaintiff were infected and injured. The claim was sustained. A number of similar cases are digested by Mr. Sedgwick in his work on Damages, sections 769, 765, 766 and 768, as follows: Where animals sold are warranted free of disease, loss through communication of disease to other animals of the purchaser may be recovered. Mullet v. Mason, L. R., 1 C. P., 559, and other cases. It is not necessary to the recovery of damages to show that the vendor knew that the diseased animal was to be placed with others belonging to plaintiff. Packard v. Slack, 32 Vt., 9. The defendant is presumed to anticipate that the animals he sells will be placed with others as a natural consequence of his act. Sherrod v. Langdon, 21 Iowa, 518. The expense of nursing and curing other animals, which contract disease *407 from those sold, may also be recovered. Long v. Clapp, 15 Neb., 417. In Randall v. Newson, 2 Q. B. D., 12, the plaintiff had bought of defendant a pole for his carriage. In driving, the horses swerved and the pole broke short off at the carriage and the horses were injured. The court held that the question should have been left with the jury whether the injury to the horses was or not a natural consequence of the defect in the pole. Where coloring matter, purchased for the purpose of coloring ice cream by a manufacturer of that article proved to be poisonous, the purchaser was allowed to recover the value of the ice cream lost through the use of the poisonous coloring matter, and also compensation for injury to business. Swain v. Schieffelin, 12 N. Y. Suppl., 155. See Jones v. George, 61 Tex., 345, also Southerland on Damages, sections 662 to 675, where the subject is discussed at length and pertinent authorities cited. There is no reason to doubt that the law is entirely settled and it is clear that if the master be found liable that liability covers all damages necessarily and directly resulting from the injurious acts.
It is also well settled that where the injury results from the default of the contracting party himself, the motive which induces the act or the omission, unless the circumstances raise a claim for exemplary damages, is of no consequence. In such case, evidence of the defaulting party’s motives, or of anything which affects only the moral character of the transaction, can have no weig'ht, and is, therefore, inadmissible. Unless the intention belongs directly to the issue, it is not an element in the case. Compensation for breach of contract in relation to the payment of money, or in relation to property, ordinarily does *408 not involve motive, for in the first ease the failure to pay, as agreed, is measured absolutely by the sum and interest, no matter what vicious purpose induced the failure, and in the second, compensation, that is, to be placed in the same position he would have been in had the other party performed his contract, is the injured party’s right, no matter how earnest the unavailing efforts to perform may have been, nor how free from intent to injure the motive of the defaulting party. 3 Parsons on Contracts, 167, and authorities cited.
Was Coit liable for the consequences of Miller’s malicious acts? In pursuing’ this inquiry it is important that we keep constantly in mind two controlling facts; one that the relations of the plaintiff and defendant were contract relations, and those between the defendant and Miller were those of master and servant. The general rule undoubtedly is, although subject to notable exceptions, that the master is not liable for his servant’s malicious acts. As shown in Wright v. Wilcox, 19 Wend., 345, where it was sought to recover against a father for the act of his son, who while driving the father’s horses and wagon, and when about his father’s business, intentionally' whipped up the horses and ran over one of a number of boys who were trying to get into the wagon. The driver at the time saw the boy was between the wheels and thus likely to be injured. Cowan, J., in deciding the case, remarked that it was impossible to-sustain' the verdict against the father because the act of the son was done with the wilful intention to .throw the boy off; that while the son was in other respects in the service of his father, he was not in this, which was a plain trespass for which the master (the father) was no more liable than if his servant had committed any other assault and battery. A *409 case not dissimilar in principle is that of Railroad Co., v. Wetmore, 19 Ohio St., 110, where the plaintiff, after purchasing a ticket as a passenger, applied to one who had the duty of checking baggage to have his baggage checked, and, by his importunate conduct and abusive language toward the servant, provoked a quarrel, in which the servant, to gratify his personal resentment, struck the plaintiff with a hatchet. It was held “that the wrongful act of the servant in striking the plaintiff cannot be regarded as authorized by the master, nor as an act done in the execution of the service for which he was engaged by the master. And the fact that the blow was inflicted with a hatchet furnished by the master, to be used for a wholly different purpose in connection with the servant’s business, is immaterial as respects the liability of the master.” It was shown by the evidence that the assault was not committed in endeavoring to eject the plaintiff from the place where the baggageman had special control, but outside of it, and at a place where he had no charge, and so was not a case of the use of excess of force, nor was it calculated to facilitate or promote the business for which the servant was employed. Other cases are to be found which go much further than these in exonerating the master. They are mostly old cases, and some of them have not been followed in the later decisions. Thus in Middleton v. Fowler, 1 Salk, 282, where in an action against the master of a stage coach, to recover for the value of a trunk of a passenger, lost by the driver, into whose possession the trunk had been placed by the traveler, it was held by Holt, C. J., that the master was not liable. The language of the judge “that no master is chargeable with the acts of the servant but when he acts in *410 the execution of the authority given, by his master,” has been given too wide an interpretation; and indeed, the law of the case would hardly be regarded as good law at the present day. See Craker v. C. & N.. W. Ry. Co., 36 Wis., 657, where the true distinction is clearly given. This case (as indeed is the larger portion of the reported cases involving the principle), was against a railroad company, the action being based on its common law liability as a common carrier, and affords an instance of strict application of the rule of respondeat superior. But courts are supposed to enforce rules of law where applicable, without respect to the personnel of the parties, and it is presumed that where liability is found to attach to the master for the act of a servant, the rule of damages would be the same whether the master were an individual or a corporation.
The modern rule, and we believe it to be well established, is stated by Mr. Mechem, in his work on Agency, section 740, thus: “The tendency of modern cases, however, is to attach less importance to the intention of the agent and inore to the question whether the act was done within the scope of the agent’s employment; and it is believed that the true rule may be said to be that the principal is responsible for the wilful or malicious acts of his agent, if they are done in the course of his employment and within the scope of his authority; but that the principal is not liable for such acts, unless previously expressly authorized, or subsequently ratified, when they are done outside of the course of the agent’s employment, and beyond the scope of his authority, as where the agent steps aside from his employment to gratify some personal animosity, or to give vent to some private feeling of his own. The question of what *411 acts are within the scope of the employment is no less difficult of determination here than in those cases where the principal’s liability for the agent’s negligence is involved, but the principles are the same. Indeed the determination of whether the principal would have been liable had the same injury resulted from the agent’s negligence or unskillfulness, will often be of aid, for if the act in the latter case would be within the scope of the employment, it is none the less so where the intention was wilful. Where the principal owes to third persons the performance of some duty, as to do or not to do a certain act, and he commits the performance of this duty to an agent, the principal cannot escape the responsibility eiviliter if the agent fails to perform it, whether such failure be accidental or wilful or whether it be the result of negligence or malice.” Continuing the author says: “What is meant is that if the agent while engaged in doing some thing which he is authorized to do and while acting in the execution of his authority inflicts an injury upon third persons, though wilfully or maliciously, the principal is liable. But if on the other hand, the agent steps aside from his employment to do some act having no connection with the principal’s business, and to which he is inspired by pure personal and private malice or ill-will, the principal is not liable.”
Mr. Justice Story, in his work on Agency, section 452, gives the rule in these words: “It is a general doctrine of the law, that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or cooperated in those act or misdeeds; yet, he is held *412 liable to third persons in a civil suit for the fraud, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty, of his agent in the course of his employment, although the principal did not authorize, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. In all such cases the rule applies, respondeat superior; and it is founded upon public policy and convenience; for in no other way could there, be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case, the principal holds out his agent as competent, and fit to be trusted and thereby in effect, he warrants his fidelity and good conduct in all matters within the scope of the ag’ency. ”
It is important to observe a distinction between liability for the malicious acts of an agent with respect to one with whom the principal holds contractual relations, acts affecting the performance of the contract, and with respect to others who may have suffered injury by reason of the agent’s torts; as a failure to observe this distinction has resulted in apparent confusion of terms both in text books and decisions. The distinction referred to is made apparent in an old English case. A traveler employed a livery stable keeper to drive him safely to his destination. The driver purposely and needlessly, to gratify his own personal malice, went out of his way to collide with another carriage by which one riding therein was injured. The collision also injured the traveler. The action by the former against the master was predicated wholly on the claim 'that he was liable for *413 the malicious act of the servant, committed without authority and not in line of his service. Any action of the traveler would have rested on the failure of the liveryman to perform his contract.
And, as to the latter proposition, Prof. Wharton, in his work on Agency and Agents, section 487, gives this terse rule: “Principal who contracts to do a particular thing is liable for agents’ torts which prevent the performance of the contract.”
One principle seems to be well settled by the later authorities, viz: That if the act of the servant which has occasioned the mischief is within the scope of the employment, the fact that it was maliciously done does not affect the question of the master’s liability under a proper rule of damages.
Coming now to the case at bar, were the acts of Miller, which caused the injury, in law the acts of his employer? That is, were they within the scope of his duties, or were they outside and beyond?And here we must not mistake the acts which caused the damage. At first blush it might seem that these acts were the watering of the milk, and those were not within any authority of the master. But not so. The putting of the water in the milk would have been quite innocuous, so far as plaintiff is concerned, had the compound not been delivered to the factory. It was the delivery there which produced the harm. In those acts of delivery Miller stood for and represented his master. Clearly those deliveries were done in the course of his employment, “in the execution of the service for which, he was engaged by the master.” Under such conditions why should the master not be liable ? He had contracted to deliver pure milk, and in trusting that duty to his servant, why had *414 he not, applying the principle announced by Judge Story, held out that servant as fit to be trusted, and warranted his fidelity and good conduct in all matters connected with the performance of that contract? Why, in reason, should the loss occasioned by the rascality of the defendant’s servant be thrown on the plaintiff? The latter had no voice in his selection; no control over his conduct. Does the servant’s motive change the nature of the damages? Does it make the failure of the defendant to perform his contract any the less obvious, or any the less serious in results? As remarked by White, J., in Railroad Co. v. Young, 21 Ohio St., 524: “Where a person is injured by the acts of a servant, done in the course of his employment, we see no good reason why the motive or intention of the servant should operate to discharge the master from liability. If the nature of the injurious act is such as to make the master liable for its consequences, in the absence of the particular intention it is not perceived how the presence of such intention can be held to excuse the master.” And would any intelligent legal mind suppose for a moment that, the alleged contract being found, if the delivery of the objectionable compound at the factory had been through the mere negligence of the servant the defendant would not be liable? Surely not. Nor does the enforcement of the rule of damages hereinbefore indicated involve punishment of one for the malicious act of another. If it were proposed to inflict punitive damag-eson the master where he is innocent of wrong intent, then that inequitable result would follow. But so long as compensation and compensation only, is the rule, the motive of the servant not entering into the case one way or *415 the other, the master is not held for the motive; he is held only for the act. So, in this case, if the testimony of the plaintiff tended to prove that Coit knew of the condition of the milk at the time of the delivery, as the record would imply, then proof to the contrary was competent, but for the purpose only of excluding the right to recover punitive damages.
This contract involved reciprocal duties, and gave corresponding legal rights. The defendant was to deliver pure milk; the plaintiff was to pay good money. Now suppose, instead of this action, there were a suit of the defendant against the plaintiff for his season’s milk, $1,150, and the company had plead payment. At the trial it appeared, that on the day the account was due the company had given the money to one of its employes with directions to go to the vendor and pay for the milk, and he had gone to the residence of the vendor and counted out as the vendor supposed, $1,150, and taken a receipt to the company. The next day when a deposit in the bank was attempted, it was found that a portion of the money was counterfeit. Suppose the testimony to further show that the employe, out of malice toward the company and greed in his own interest, had substituted counterfeit money and paid that. Would the company have a defense? The bills paid looked like good currency, as the milk delivered looked like pure milk. In fact both were tainted. Is there any real difference in the two cases? Isn’t it a failure to perform a contract in both? True, the method of making proof of damages is different; it is simple in one case, and. much less so in the other. But when arrived at, the result is precisely the same. *416 It is compensation in both cases — the making of the injured party whole.
Our case is essentially dissimilar from that of Railroad Co. v. Wetmore, supra, where the defendant was exonerated. If Miller had got into a quarrel with the manager of the factory, about the delivery of milk, for instance, and, to gratify his own personal resentment, had lashed the other with the defendant’s, whip which had been furnished him to drive the horses with, we would have a case parallel with the one above cited. If, on the other hand, the baggage man in the case last cited, impelled by the same malicious motive which induced the assault on the passenger, had, with the hatchet smashed the passenger’s trunk, the question involved would have resembled the case at bar.
The view here indicated finds support in the broad principle that where one of two innocent persons must suffer he must be the sufferer who puts it in the power of the wrong doer to cause the loss. “He, certainly, who trusts most, must suffer most.” He through whose agency the loss occurred must sustain it. It is a principle founded on the highest considerations of justice and expediency. The rule is elucidated in the opinion by Minshall. J., in the recent case of Shurtz, Adm’r, v. Colvin, 55 Ohio St., 274, and special reference is here ade to that opinion for argument and illustrations. See, also, Quick v. Milligan, 108 Ind., 419; Blight v. Schenck, 10 Pa. St., 293; LeNeve v. LeNeve, 3 Atk., 646.
If the foregoing conclusions are correct, it follows that the constructions given the jury did not cover the case before them. The ease made was the case_ which, within the allegations of the *417 petition, the evidence tended to prove. The vital points were the agreement to deliver pure milk, the delivery under it, the character of the milk delivered, and the resulting damage, and the questions the jury needed instructions upon, in case they found for the plaintiff on these propositions, were the liability or non-liability of Coit, and the measure of damages in case he was to be held. The instruction given was if the adulteration was done by Miller maliciously to injure Coit, and the delivery of the adulterated article was without Colt’s knowledge, he was not liable for any damage; which, if we are right in the principles of law applicable to the case, was erroneous. The court also added that Coit would remain liable for the amount of water delivered, because it was- not milk. This means, we suppose, that, on Coit’s cross-petition, he would not be allowed to recover pay for water. Of course he could not, but this instruction ignores, any duty to deliver milk not adulterated, and would be proper in a case where the quantity delivered was the only question involved. But here was involved the question of damages for the impaired character of the article delivered, and it is difficult to see how, upon the view most favorable to Coit, the rule would not have been the ordinary commercial rule, viz.: The difference between the value of the milk delivered and what its value would have been had no water been mixed with it. Swan’s Treatise, 14th Ed., 784., Am. Note to Benjamin on Sales, 6th Ed., 906.
There is another ground which would appear to defeat the attempted defense. The sale and delivery of adulterated milk is an offense against one of the pure food statutes. The act of April 10,1889, entitled “An act to regulate the sale of milk,” 86 *418 Ohio Laws, 229, provides: “That whoever, by himself, or by his servant or agent, * * * sells, exchanges, or delivers * * * adulterated milk, or milk to which water or any foreign substance has been added * * * shall be punished,” etc. In the case of The State v. Kelley, 54 Ohio St., 166, it is held that in a prosecution under the act of March 20, 1884, “to provide against the adulteration of foods and drugs, it is not a defense that the accused is ignorant of the adulteration of the article which he sells or offers for sale.” These statutes have a like purpose.• They are founded on the policy of protection to the public, the same policy which is recognized in numberless eases where on a sale by victuallers of articles of food for domestic consumption the law implies a warranty that they are fit for such purpose, and the seller will not be heard to say that he did not know they were not, nor to plead good faith in their sale. The rule of construction applied to the act last cited applies equally to the act to regulate the sale of milk; and it is the theory of the decision cited that it is the duty of the party who, by himself or agent, sells such articles, to know their qualities; they must know or take the consequences. An opposite construction, it is declared by the court, would defeat the humane purpose of the acts. The principle of Rose v. King, 49 Ohio St., 213, rules this case with respect to the civil remedy. Where a defendant is liable under the criminal statute, he is liable to a person directly injured, civilly, unless the language of the criminal statute indicates an opposite purpose, which is not the case here.
These conclusions require a reversal of both judgments, and a new trial.

Reversed.