# HARRISON, Appellant, v. CRAVEN.

Division One, May 24, 1905.

1. **FRAUD: Release: Bar to Suit for Damages.** The defendant had been the agent of the owners of a lot and house for the collection of rents, and the petition charges that he had for five years collected the rents, but represented to them that none had been collected. At the end of that time he bought the lot, and they settled their mutual accounts, he releasing all claims for taxes paid, and they the rents collected. Afterwards discovering that defendant had collected a large amount of rents, they assigned their claim therefor to plaintiff, and he, without any allegation in his petition asking that said release be set aside, sues for said rents, and the answer pleads the settlement. *Held,* that the release barred recovery, unless set aside.

2. **———: Action for Non-Assignable.** A cause of action based on fraud against the assignor is not assignable. And where the owner of a lot and house has made a settlement with his agent

for rents collected by him for which he had not previously accounted, although such settlement was procured by fraudulent representation to the owner that no rents were collected, the assignee of such owner cannot by purchase obtain the right to have said fraudulent settlement set aside.

3. **DAMAGES: Equity.** Where the damages sued for are of an allowable character, a court of equity having once obtained jurisdiction of the subject-matter of the suit, can award damages, as well as relief in kind.

4. ————: **Agency: Breach: Increase Price of Material.** In order to entitle the prospective purchaser of a lot to damages from an agent for his breach of his contract of agency to purchase the lot the damages must be such as are a probable and natural result of the breach. And where the defendant was to purchase the lot for plaintiff at not to exceed a certain price, and purchased it at a less price and took the title in his own name, and refused to transfer it to plaintiff, whose purpose in buying the lot was to erect a sanitarium thereon, plaintiff cannot recover as damages the difference in the price of material and labor between the date of the contract and the time of suit, time being not of essence of the contract, and plaintiff having at the time no contract for the building at a fixed price, and there being no allegation or proof that defendant knew that the price of labor and material was going up or that plaintiff was bound by a contract to build which he was to perform within a certain time. Those damages, under the circumstances, are too remote and speculative to be attributable to defendant's breach of contract.

5. **AGENCY: Existence of Contract: Construction of Dishonesty.** The courts will not, in the interest of a litigant, construe his letters to the owner of property, in which he states he is trying to purchase it for another, as dishonest. He cannot avoid the existence of the contract to purchase the property for his employer, by saying those statements were mere ruses or makeshifts or coloring matter to procure a conveyance for himself and had no reference to an existing fact.

6. ————: **Purchasing Property for Another: Equity.** An agent who under his contract of employment to purchase a lot for another, purchases it and takes the title in his own name, although the contract be verbal, will be held to hold the title for his employer, and a court of equity will decree the title out of him and into his employer, requiring an accounting for rents and taxes and interest in the meantime.

7. ————: **Speculating Off Employer.** An agent cannot speculate off of his employer in the subject-matter of his employment, nor can he place himself in a situation where self-interest com-

pels him to overreach his principal. And where an agent agreed to buy certain property for his employer, but instead of doing so took the title in his own name, thinking thereby to be able to dictate terms to his employer, who had arranged to build a sanitarium on another part of the lot, to which this was necessary for its complete efficiency, a court of equity will hold that he holds the title in trust for his employer.

8. ———: Contract to Purchase Land: Statute of Frauds. Letters addressed to third parties; such as the owners of land and their agent, written by a defendant who denies that he was plaintiff's agent for the purchase of land, are sufficient memoranda in writing to remove the transaction from the Statute of Frauds, if those letters reveal the fact that defendant was acting for plaintiff.

9. ———: ———: ———: To Protect Fraud. The Statute of Frauds is not a weapon to be used in the perpetration of a fraud. That statute does not apply to trusts *ex maleficio*.

10. ———: ———: Letters to Grantees. Where plaintiff alleges that defendant agreed to buy a lot for plaintiff as his agent, but bought for himself, letters written to the grantees by defendant are to be read with the deed, as a part of the transaction.

11. ———: ———: Trusts Ex Maleficio. The fraudulent conduct of an agent, employed to buy land for his principal, in taking the title in his own name, in repudiating the agency, in violating the terms of the agency, and in seeking to speculate off of his principal, will create a trust in him in the land, placing it in the class of trusts denominated trusts *ex maleficio*. And equity, as a court of conscience, is not hampered by the Statute of Frauds in righting the wrong.

12. ———: ———: ———: Relief. Relief in such cases must be granted on terms. The agent is entitled to no commissions for his services where he took the title in his own name when he should have taken it in his principal's name and when he seeks to hold on to it. And he should be charged with the rents from the time of the purchase to date of the decree, and credited with the taxes paid by him. The principal should be charged with the money paid by the agent for the lot, and, if he has not kept his tender good, interest thereon.

13. ———: ———: Commissions. An agent who acts in bad faith with his principal is not entitled to compensation or commissions.

Appeal from Clay Circuit Court.—*Hon. J. W. Alexander*, Judge.

REVERSED AND REMANDED (*with directions*).

*T. W. Harrison* and *Edwin Silver* for appellant.

(1) An equity case is tried *de novo* in the appellate court, as if it originated there. Sheridan v. Nation, 159 Mo. 27; Railroad v. Brandon, 81 Mo. App. 1; Robertson v. Sheperd, 165 Mo. 360. The appellate court will examine the facts and render judgment for the right party, notwithstanding the findings of the trial court. Donivan v. Donivan, 157 Mo. 157; Fitzpatrick v. Weher, 168 Mo. 562; Hoeller v. Haffner, 155 Mo. 589. (2) The agency being clearly established, the trust necessarily follows, and it only remains to consider the effect of that agency and the liability of the respondent thereunder. Price v. Comstock, 121 Fed. 622; Ins. Co. v. Smith, 117 Mo. 295; Grumley v. Webb, 44 Mo. 454; Eoff v. Irvine, 108 Mo. 383. In Grumley v. Webb, 44 Mo. 451, the court says: "Nothing is better settled than that an agent or a trustee, or any person acting in a fiduciary capacity, cannot speculate for his private gain with the subject-matter committed to his care, to the prejudice of his principal. He cannot be allowed to purchase an interest in property where he has a duty to perform which is inconsistent with the character of purchaser. The law does not presume that such a transaction will always be impressed with fraud, but it furnishes an inducement to fraud, and affords opportunities to persons, who should always act with the most conscientious and scrupulous good faith, to abuse their trust, and therefore, a total disability is enjoined, to take away all temptation." Jamison v. Glascock, 29 Mo. 191; Boardman v. Florez, 37 Mo. 559; Jacques v. Edgell, 40 Mo. 77; Thornton v. Irwin, 43 Mo. 153; State, etc., v. McKay, 43 Mo. 594; McNew v. Booth, 42 Mo. 189; 1 Am. and Eng. Ency. Law (2 Ed.), 1060; Opie v. Serrill, 6 W. & S. 264; Mechem on Agency, sec. 478. If the agent once enters upon the execution of the business, and any loss results from his neglect or

failure, he may be held responsible. 1 Am. and Eng. Enc. of Law (2 Ed.), 1060. By undertaking the work he becomes an agent, whether he could have been compelled to act as the agent or not, and is then bound to carry out his instructions in good faith. Spencer v. Towles, 18 Mich. 9; McGee v. Best, 6 J. J. Marsh. (Ky.) 453; Walker v. Smith, 1 Wash. (U. S.) 152; Williams v. Higgins, 30 Md. 404; Passano v. Acosta, 4 La. 26 (23 Am. Dec. 470). An agent is in all cases bound to act in good faith. Mechem on Agency, sec. 495; Page v. Wells, 37 Mich. 415; Whitney v. Merch. Union Exp. Co., 104 Mass. 152. An agent employed to manage, care for, or sell real estate cannot acquire interests in it adverse to his principal. Mechem on Agency, sec. 468; Ellsworth v. Condray, 63 Iowa 675; Collins v. Rainey, 42 Ark. 531; Woodman v. Davis, 32 Kan. 344. (3) Defendant having entered upon the performance of the employment by plaintiff to purchase the lot for plaintiff and having acted in bad faith in that service and taken the title in his own name for the purpose of cheating and defrauding plaintiff, a resulting trust arises in favor of plaintiff. Hillman v. Allen, 145 Mo. 643; Curd v. Brown, 148 Mo. 82; Butler v. Carpenter, 163 Mo. 606; Damshoerer v. Thias, 51 Mo. 103; Cloud v. Ivie, 28 Mo. 579; Groves v. Fulsom, 16 Mo. 543; Turner v. Johnson, 95 Mo. 431; Leahy v. Leahy, 11 Mo. App. 413; Cash v. Clark, 6 Mo. App. 636. Part performance of an oral contract will take it out of the Statute of Frauds. Fuchs v. Fuchs, 48 Mo. App. 23. Full performance by one of the parties takes it out of the statute. Hall v. Harris, 145 Mo. 622; Bless v. Jenkins, 129 Mo. 657; Mooks v. Davis, 72 Mo. App. 562. Implied, constructive and resulting trusts are not within the Statute of Frauds. Peacock v. Nelson, 50 Mo. 261; Baier v. Berberick, 6 Mo. App. 540; Shaw v. Shaw, 86 Mo. 598. Where one obtains title to real estate for the benefit of another and then attempts to hold it, a trust arises by implication in favor of the prin-

cipal which a court of equity will compel the agent to
execute. Such cases are not within the Statute of
Frauds. Peacock v. Nelson, 50 Mo. 261; Groves' Heirs
v. Fulsom, 16 Mo. 549. A verbal agreement to pur-
chase lands for another is not within the Statute of
Frauds. Turner v. Johnson, 95 Mo. 447; Michew v.
Booth, 42 Mo. 192; O'Fallon v. Clopton, 89 Mo. 290;
Potter v. Jacobs, 117 Mass. 132; Temple v. Johnson,
71 Ill. 13. Any memorandum signed by the party to be
charged would be sufficient to take the case out of the
Statute of Frauds. Mastin v. Grimes, 88 Mo. 484; Fry
on Specific Performance of Contracts, secs. 295, 346;
Waterman on Specific Performance of Contracts, sec.
201; Pomeroy on Specific Performance of Contracts,
sec. 395. A letter written to a third party by the per-
son to be charged would be sufficient to take it out of
the Statute of Frauds. Moore v. Mountcastle, 61 Mo.
424; Cunningham v. Williams, 43 Mo. App. 631; G. B.
G. Co. v. Cooper, 23 Mo. App. 301; Cash v. Clark, 61
Mo. App. 641; 1 Greenleaf on Evidence, sec. 268. It
is the settled law in this State that where a memoran-
dum for sale is made by one of the parties as agent for
a third person who is not named therein, and this ap-
pears in the memorandum, parol evidence is admissible
to show who the unnamed principal is. Kelly v. Thuey,
102 Mo. 529; Mauts v. McGuire, 52 Mo. App. 150; Hig-
gins v. Dellinger, 22 Mo. 400; Briggs v. Munchon, 56
Mo. 473; Hartzel v. Crumb, 90 Mo. 640; Klasterman v.
Loos, 58 Mo. 294; Ins. Co. v. St. Mary Seminary, 52
Mo. 480; Musser v. Johnson, 42 Mo. 74; Shnetz v. Bai-
ley, 40 Mo. 69; Smith v. Alexander, 31 Mo. 193. Story
on Agency, sec. 160a; Whart. on Agents, sec. 403; Fry
on Specific Performance, sec. 148; Huntington v. Knox,
7 Cush. 371; Briggs v. Partridge, 64 N. Y. 357.

*William E. Fowler* and *Sandusky & Sandusky* for respondent.

(1)   There is substantial evidence to sustain the findings of the court below, and the judgment should not be disturbed.   Dunivan v. Dunivan, 157 Mo. 157; Becht v. Becht, 168 Mo. 525; Chance v. Jennings, 159 Mo. 544.   (2)   All that passed between appellant and respondent was verbal; and if any employment of respondent, with reference to the lot, was had by appellant, it was within the Statute of Frauds. Allen v. Richards, 83 Mo. 55.   (3)   The rent account was settled, and a receipt in full taken from the Nichols heirs, prior to appellant's alleged assignment of the rents to him.

LAMM, J.—Harrison sued Craven in two counts. In the first count of an amended petition he alleged, in substance, that Craven was a real estate agent in the city of Excelsior Springs, Clay county, Missouri; that Harrison purchased lots nine and ten in block ten, in the city of Excelsior Springs, in February, 1902, and procured title thereto except as to the north one-fourth of lot ten, said north one-fourth being a small strip seventeen and one-half feet wide by forty feet long, lying next to an alley; that said property was purchased for the purpose of erecting a building for sanitarium purposes, which building, because of the peculiar location of the ground, could not be erected without first obtaining the said north one-fourth of lot ten, all of which was well known to said Craven.   That said Craven represented to Harrison that he knew where the owners to said strip were, that they were three heirs and hard to deal with, but that he was in communication with them and could buy said strip at a reasonable price and for less than any one else could, and would undertake to get said strip from the owners for Harrison.   That thereupon Harrison employed Craven as his agent to purchase said strip from its owners and

authorized him to offer not to exceed $325, and it was the agreement that Harrison would furnish the money and that the building on said strip, worth from fifty to seventy-five dollars, should go to Craven for his services as agent. That Craven accepted said employment, went into correspondence with the owners of said strip, whose residence, whereabouts and names were unknown to Harrison, and, in pursuance of said employment, negotiated the purchase of said strip and purchased the same for the sum of $300, while acting as the agent of plaintiff. That in violation of the contract or agency and in bad faith towards Harrison, with intent to cheat, wrong and defraud him out of said strip, or to "hold up" Harrison and compel him to pay an exorbitant price therefor, or prevent the erection of said sanitarium, Craven took title in his own name on March 12, 1902, and recorded his deed; that thereupon Harrison, on or about the 24th of April, 1902, tendered Craven $325 of lawful money of the United States—he, Harrison, not knowing at the time the exact sum said Craven had paid for the strip as his agent—and thereupon demanded a deed from Craven and at the same time tendered him the building on said strip, but said Craven refused to accept anything less than $500 and demanded said $500 and the building before he would make a deed, falsely alleging and claiming that he had paid $500 for the strip—all of which was done by Craven for the purpose of cheating and defrauding Harrison as aforesaid. That Harrison was at all times able, ready and willing to pay the price which the heirs owning the strip asked therefor and kept the money lying in the bank to pay for same.

It is further averred that because of the wrongful conduct of Craven, the construction of the sanitarium had been delayed for a year, and that Harrison was damaged thereby in the sum of $1,000 "in the increased cost it will require in the erection of said building." That Harrison keeps his tender good and offers to pay

Craven $325 for the strip and give him the building, or to pay him such sum as the court shall deem just and equitable, and tenders the same into court for the use and benefit of said Craven for said title; but, Harrison avers, Craven by reason of his bad faith as aforesaid is not entitled to any compensation for his services and is only entitled to receive at the judgment of the court such sum as he actually paid out.

It is further alleged in said count that Craven is receiving and appropriating the rent of said property at the rate of $5.00 per month since March 12, 1902, and refuses to convey the property to plaintiff, and refuses to account to plaintiff for said rent, and refuses possession.

The prayer is for a decree of title, that Craven may be denied all compensation, and may be compelled to account to plaintiff for all rents and profits as aforesaid, and be mulcted $1,000 by way of damages for the fraud and deceit and for delaying and preventing the construction of the sanitarium aforesaid.

The second count of the petition is at law and sets forth that Craven as the agent of Pearl Nicolds, Ora F. Turpin, Byrd F. Lawrence and Dovie Nicolds, the owners of said strip, to rent and collect rents for its use and pay the same over to said owners, rented the same, collected rents at the rate of $5 per month for every month since the first of January, 1897, up to the first day of March, 1902, and that, in violation of the terms of his agency as such rent collector, he failed to pay over all said rents, appropriated the same to his own use and behoof, and thereby became indebted to said owners in the amount thereof, to-wit, the sum of $360.30, principal and interest. That said owners had no knowledge that Craven had collected and appropriated said rents until May 1, 1902, after the purchase of said strip for plaintiff. That on the facts coming to light they demanded of him to account for

and pay over said rents, which he refused and still refuses to do.

An assignment of said rents by the Nicolds heirs to Harrison under date of March 12, 1902, really made on June 2, 1902, is averred, and it is alleged that said rents have not been paid to plaintiff, principal or interest, and are now due by Craven to plaintiff, for which he demands judgment in addition to the prayer and demand for judgment in the first count.

The answer is a general denial of every allegation in the first and second counts of the amended petition, and it then pleads the following affirmative defense to the second count:

"And the said defendant further answering the second count in said amended petition contained, alleges that on the 12th day of March, 1902, he purchased the property described in plaintiff's amended petition, being the north half of the north half of lot ten, in block ten, in the city of Excelsior Springs, Clay county, Missouri, for the price of $300, by deed recorded in book 126, at page 318, of the deed records of Clay county. Said deed was delivered on or about March 24, 1902; as a part of said contract of purchase the defendant released all claims in his favor for the taxes or expenses of any kind paid or incurred by him on account of said lot, and the grantors in the said deed to him released any and all claims against defendant for rents collected on account of said property, and the sum of $300 was paid by this defendant to the grantors in said deed for said property under said agreement. Defendant alleges that said accounts for rents sued for by plaintiff in second count has been settled as herein stated and said settlement was made by the grantors in said deed to defendant before the assignment of said rents by the said grantors to the plaintiff in this cause, if any assignment was made. And said settlement has not been set aside but remains in full force. Wherefore,'" etc.

The replication was a special denial of the allegations of affirmative matter in the answer.

A jury being waived in the law count, the cause was submitted to the court in November, 1902.

At the close of the evidence the plaintiff was permitted to amend his petition to conform to the proofs, which amendment in substance sets forth that by reason of the breach of good faith on the part of Craven as set forth in the petition, the construction of the sanitarium therein described can not be commenced or proceeded with until this action be determined and the title of the north one-fourth of said lot is vested in plaintiff; that it was the intention and determination of plaintiff to proceed at once on the 1st day of April, 1902, in the construction of such sanitarium to cover the whole of said lots, they being seventy feet north and south, and eighty feet east and west. The amendment then gives a specific description of the building to be constructed and avers that it could have been contracted for in April, 1902, at from twelve to thirteen thousand dollars. That Harrison was prevented from letting the contract by Craven's wrongful acts aforesaid, and that the increase in the price of labor and material from April to the present time has been such that the same building will now cost $17,000 and that of such increased cost, at least $3,000 is attributable to the wrongful acts of Craven in preventing the letting of the contract, and that Cravens should be held to pay the further sum of $3,000 as ''plenary damages.'' And then prays judgment as set forth in the amended petition and for the further sum of $5,000 damages.

No special finding of facts was requested, and the court having taken the cause under advisement until the next term, found the issues generally on both counts for the defendant. Whereupon plaintiff excepted to the finding and filed his proper motions, which being

overruled, he saved exceptions and in due form appeals. The vital facts will be stated in the opinion.

I. No error was committed in finding for respondent on the second count for assigned rents, because the answer pleads a settlement between respondent and the Nicolds heirs and a release of liability, and the undisputed proof showed such settlement and written release were had and made by the said heirs prior to their assignment to appellant, thus barring recovery, unless set aside. It is contended by appellant that this settlement and release were fraudulent products resulting from a breach of a fiduciary relation existing between respondent and said heirs in relation to the matter of collecting and accounting for rents, and should be brushed away. Allowing this contention force, yet as there was no paper issue tendered relating to such fraud, an issue of fraud was not properly in the case, and, hence, the proofs on that score need no attention on appeal.

Not only so, but such fraud, if existent, was no legal concern of appellant. It came well within the maxim *res inter alios acta,* and the question is controlled by elementary law to the effect that a cause of action based on fraud against an assignor is not assignable. [2 Story's Equity (13 Ed.), sec. 1040g; 3 Pomeroy's Equity (2 Ed.), sec. 1276; Jones v. Babcock, 15 Mo. App. 149; Wilson v. Railroad, 120 Mo. 45; Haseltine v. Smith, 154 Mo. 404; Hayward v. Smith, 187 Mo. 464.] And, therefore, appellant could not acquire by purchase the right to set the fraudulent release aside.

There is an exception to the general rule that a right of action for fraud is not a vendible commodity and may not be speculated in (see Haseltine v. Smith, supra, and Hayward v. Smith, supra), but the case at bar does not come within the exception, and on grounds of public policy relating to actions savoring of maintenance, if on no other ground, the action of the trial court was right.

II. There was no error, *nisi*, in finding for respondent on the first count, in so far as the damages claimed were concerned. The trouble does not lie with the right of a court of equity to deal with the subject of damages, were the damages of an allowable character; for a court of equity to deal with the subject-matter of a suit within its grasp, will go on and retain its grasp on the *res* in order to avoid circuity of action and do rounded-out and complete justice by awarding damages as well as relief in kind. [Baile v. Ins. Co., 73 Mo. l. c. 384; Woodard v. Mastin, 106 Mo. l. c. 362; Morrison v. Herrington, 120 Mo. l. c. 668.]

The trouble on this branch of the case arises over the character of the damages sued for, consisting in an alleged increase in the cost of labor and the price of material. Evidence was introduced, and remained uncontradicted, that the cost of labor and material in the erection of a building of the plan and character contemplated by appellant, had increased from the 1st of April, 1902, up to the date of the trial in the sum of $5,000. In considering respondent's liability for that increase, it must be noted that this is not a case where a building contract existed for the purchase of material at a certain price and which contract was violated and the breach was being sued on. It might well be that, in a case of that character, the measure of damages would be the difference between the price contracted to be paid and the price rendered necessary by the breach. Nor is it altogether aside the case to say that the evidence showed no building contract existed, that plans were not formulated for the building at the date of the alleged contract of agency and that the very matter of building was somewhat *in nubibus*, and held potentially within the whim of appellant.

It is not alleged or shown that respondent knew that the price of labor or material was going up; nor is it alleged or shown that respondent knew that appellant was bound in any contract to build which he was

obliged to perform within a certain time, or at all; nor is it shown or alleged that time was of the essence of respondent's contract of agency, or that the time in which he was to perform his contract was controlled by the obligations of any other binding contract appellant was under, so that the case is not within the reasoning of those cases where parties have contracted with an eye to special conditions then existing or subsisting contracts outstanding.

It is hornbook law that damages flowing from a breach of a contract of agency, like all other damages predicated of the violation of a contract, must be such as are a probable and natural result of the breach, such as arise naturally in the usual course of things and are reasonably within the contemplation of the contracting parties. Remote or purely speculative and problematic damages and those arising from independent causes in nowise attributable to the breach, mere possible damages, will not be allowed. The maxim, *causa proxima, non remota, spectatur,* applies in full vigor. [Mechem on Agency, sec. 474; Story on Agency (9 Ed.), sec. 217 c.]

The agency here, if any, did not relate to labor or material, but wholly concerned the purchase of a strip of ground and the damages sued for in this case are too remote and speculative to be recovered on the facts before us. It is within the common knowledge of mankind that many adventitious circumstances enter into the cost of a building to be erected, *e. g.,* the danger of strikes and lockouts, competition, the shrewdness and level-headedness of the contracting parties, combinations, trusts, etc., enhance or depress building prices. If the cost of labor and material had gone down and not up, and had appellant been benefited thereby, could it also be contended that such result was due to respondent's violation of the contract of agency? The large amount of damages claimed in this case, as an increase of cost of labor and material, shows that at least one of

the parties, to-wit, appellant, did not have a possible increase in the cost of labor and material in his mind in dealing with respondent; for if he had such object in view, is it likely he would have subjected himself to the danger of so great an injury, by refusing to pay the $175 in addition to the tender, which respondent claimed, thus placing himself dangerously near being drawn into the vortex of the maxim, *volenti non fit injuria,* controlling this class of cases, as others? [Wright v. Bank, 110 N. Y. l. c. 245.]

We have been cited to no controlling authority holding that the character of damages sought here is the natural or probable result of a breach of a mere contract of agency having for its purpose and scope a duty to negotiate the purchase of a certain specified tract of land, and we hold the case at bar was properly decided on the question of damages.

III. The pivotal question in this case turns upon the fact of the existence of a contract of agency. Did one exist? The oral testimony on this score was in direct conflict, and if there were nothing more in the case, the decision should pass off on the rule of appellate practice to the effect that the finding of the chancellor, *nisi,* who had the aid of eye and ear in receiving and weighing oral testimony, ought to be deferred to somewhat. But the oral testimony is supplemented, as will be pointed out later, and this fact modifies the rule.

The testimony is undisputed that Dr. Gaines of Excelsior Springs and appellant, a resident of Topeka, Kansas, realizing a need for modern and scientific sanitarium privileges at Excelsior Springs, devolved a scheme for constructing such sanitarium, covering the whole of lots nine and ten in block ten at that resort. These lots were held in parcels by different owners—one being held by the son of respondent—and a narrow strip of seventeen and one-half feet wide on the north side of lot 10, cutting off the residue of the lots from the alley, was held by the Nicolds

heirs who were non-residents, and whom respondent represented as agent for renting purposes only. Respondent theretofore had made an ineffective effort to purchase the Nicolds strip for others, but this plan was abandoned. Early in February, 1902, respondent was applied to by appellant to negotiate the purchase of the Nicolds strip in order to consummate said sanitarium scheme—the strip being necessary, because, among other things, of the fact that the sewer lay in the alley and was of small dimension, and hence one sewer connection with the sanitarium would not be of a size to be efficient, and the situation demanded that separate sewer connections be made with the various bath-rooms, closets, etc., of the sanitarium, and called for free access to the sewer along the whole north side of lot ten. Evidence was introduced showing on the part of appellant that he had already acquired the other parcels and took respondent into his confidence and employed him to secure this remaining strip at a price not exceeding $325, respondent to have as his commission a dilapidated house standing thereon, valued at from fifty to seventy-five dollars—the deed to be taken in appellant's name, and the money to be advanced by appellant to procure the deed when the negotiation resulted in the right to one.

Respondent denied all this and introduced evidence tending to show there was no employment whatever, but that appellant merely came to him and offered him $375 for the strip and was informed by respondent that he did not own it and could not sell it. Shortly afterwards respondent acquired the title, as he claims, for his individual use and purposes, but, as appellant claims, pursuant to his employment as agent.

Putting to one side the oral testimony directed to the fact of agency, in issue, the following letters throw unerring light on the transaction and furnish wherewithal upon which to base a theory of agency.

"Excelsior Springs, Mo., Feb. 13, 1902.

"A. F. Davis, Esq., Fayette, Mo.

"Dear Sir: Yours of the 12th received and contents noted. Our previous offer was $200, and my son then wanted it at that price. He don't want the property now, *but I have a buyer for the whole corner now and think I can get the Nicolds heirs $300 for their one-fourth lot.* Let me know as soon as possible if this will buy it, and I will let you know what I can do in the matter.

"This, I think, is a good fair price for the property.                                Yours truly,

"JOSHUA CRAVEN."

Indorsed: "Miss Pearl, please answer this, A. F. Davis."

"Excelsior Springs, Mo., Feb. 22, 1902.

"Miss Pearl Nicolds, Carrollton, Mo.

"Miss Nicolds: Your favor of Feb'y 21st rec'd, and I enclose you deed and instructions from my attorney. *I have the deed made to me because the party who wants it is out of town. You will please attend to this matter as soon as possible as the parties want to move building off right away.* When the papers are properly filled out you can send them to the Clay County State Bank and the bank will send you the money.

"Yours truly,

"JOSHUA CRAVEN."

"Excelsior Springs, Mo., March 4, 1902.

"Miss Pearl Nicolds, Sullivan, Ind.

"Miss Nicolds: Your favor of 3-1 rec'd. I was at county seat recently and finished paying macadam tax bill and costs, and the taxes are all paid. The property is all clear now unless some of you have placed a lien of some kind upon it. I have just about enough rents so far to pay all expenses. I will pay you the $300 net on receipt of deed.

*"Please hurry the matter as much as possible as the parties want to go to work upon the property.* If you like, send the deed to Clay County State Bank and they will send you the money.

"Yours truly,

"JOSHUA CRAVEN."

"Excelsior Springs, Mo., June 12, 1902. "Miss Pearl Nicolds, Carrollton, Mo.

"Miss Nicolds: Will you please send me letters or copies of them I have written you in regard to the purchase of your property here. *The parties who were to purchase the property* are suing me and trying to force me to take $325 for it, when you know, it cost me more than that. Especially will you send me the two letters I wrote Mr. A. F. Davis in, I think, February last? I will appreciate this very much if you will attend to it at once.                    Yours truly,

"JOSHUA CRAVEN."

No one can read the above letters without concluding that the contention of respondent that he was acquiring the title to this strip as an individual matter, is an afterthought, born of an emergency; for it is substantially agreed on all hands that the purchaser alluded to in these letters was appellant, and no other. The record further discloses that the only explanation offered by respondent of the admissions in his letters, is that such statements were mere allowable stratagems or *ruses de guerre,* makeweights or coloring matter, to procure a conveyance and had no reference to any existing fact. In other words, we are asked to construe respondent's letters as dishonest, and this in his own interest, which we decline to do.

The written admission by respondent that he purchased the strip for appellant irresistibly treads back and indicates a prior employment to do that very thing. Therefore we hold such agency existed and that the title was secured pursuant to such employment.

Treating the case, then, as one where an agency existed, we are persuaded by the testimony that it did not contemplate respondent should take the title in his own name. Respondent's own excuse for so doing, in his letter of February 22d, was the alleged absence of appellant. This excuse should be disallowed for reasons. In the first place, while appellant may have been absent, Doctor Gaines, jointly interested with him in the sanitarium scheme, was a resident and at hand. In the next place, the record shows that appellant had provided funds for the purchase and that they lay in the bank. In the third place, respondent was inquired of from time to time in regard to the negotiations, concealed the progress and final success of them and made no application to the appellant for the money to complete the purchase or for leave to have the title taken in his own name, but evidently made these concealments and omissions and took the title in that form to gain the vantage ground of being able to dictate terms to appellant.

A significant feature of the case is that it is shown that the Nicolds heirs made the conveyance to Craven, intending it to enure to the benefit of appellant. And they understood that the form of the conveyance, to-wit, to Craven, himself, was but a means to that end, and that Craven's name was a mere temporary resting place for the title, created by him as a matter of convenience and because of the absence of the real purchaser.

This brings us to the question whether under such circumstances a court of equity will compel respondent to disgorge the title thus acquired.

Assuming the fiduciary relation resulting from the contract of agency, it is elementary law, not needing fortification by citation of authority, that an agent may not speculate off of his principal in the subject-matter of his employment, that he may not place himself in a situation where self-interest impels him to overreach

his principal, that he may not seize benefits with both hands, coming as well as going, and further that a court of conscience, when a trust results from such wrongful conduct, will stretch forth its arm and strip him of all benefits acquired at the expense of his principal and which should enure to the principal's advantage under the terms of the employment.

Respondent cites and relies upon Allen v. Richard, 83 Mo. 55, but that case is not the case at bar. That was a suit at law and the Statute of Frauds was invoked. No memorandum in writing signed by the party to be charged was introduced in evidence in Allen v. Richard, and three considerations render that case inapplicable to the record facts here: (1) Here the letters signed by respondent may well be considered memoranda in writing, although addressed to a third person. [Moore v. Mountcastle, 61 Mo. 424; Cunningham v. Williams, 43 Mo. App. 629; Cash v. Clark, 61 Mo. App. 636; Browne on Statute of Frauds (5 Ed.), sec. 354a.] (2) The Statute of Frauds was never intended as a weapon to be used in the perpetration of fraud, and (3) the letters of respondent must be read with the deed executed by the Nicolds heirs. All these constitute one transaction and together sufficiently describe the property, the consideration and the terms so as to place the matter without the provisions of the statute, even should it be held the Statute of Frauds applies to *trusts ex maleficio.*

Furthermore, "equity, as a code of conscience, takes cognizance of more delicate distinctions between right and wrong in human conduct and enforces a subtler morality than the traditional practice and procedure of courts of law have been considered capable of adjusting and administering. Hence in equity many acts are dealt with effectively as fraudulent, although they would admit of no remedy at law." [McFarland v. Railroad, 125 Mo. l. c. 276.] The fraudulent conduct

of respondent in taking this title in his own name, in repudiating the agency, in violating the terms of the agency and in seeking to speculate off of his principal, may well create a trust in him as to the real estate in question, placing it in a class of trusts spoken of in the books as trusts *ex maleficio.* [2 Pomeroy's Equity (2 Ed.), sec. 1053; Trice v. Comstock, 121 Fed. 620.]

It was, therefore, error in the court below to refuse to vest the title to the north one-fourth of lot ten in block ten in the town of Excelsior Springs, out of respondent and into appellant.

IV. Relief must be granted on terms. The price paid by respondent was $300. It is true the record discloses that respondent contended that he, as agent for the Nicolds heirs, had paid out more in outlays, taxes, repairs, etc., than the amount of rent in his hands, and that this excess of outlays was reimbursed to him by the conveyance of the real estate. But a patient examination of the testimony leads us to the conclusion that this contention ought not to be sustained. Respondent and the Nicolds heirs "swapped accounts" and mutually released each other from liability and the actual amount of cash paid by respondent was $300. The rents then in hand more than made respondent whole for outlays and the excess contended for is mythical.

The record facts are of such a character as to destroy any right in respondent for compensation for his services. An agent who acts in bad faith with his principal is not entitled to compensation or commission. [Paul v. Machine Co., 87 Mo. App. l. c. 654; Mechem on Agency, sec. 619; Trice v. Comstock, 121 Fed. l. c. 622.] The denial of compensation to respondent, either in money or by turning over to him the house situated on the strip, results in giving appellant the rents accruing since the date of the delivery of the deed from the Nicolds heirs to respondent. On the other hand, as there is nothing in the record to indicate that the tender was kept good by actual deposit of money in

court, appellant should pay interest to respondent at the rate of six per cent on $300 from the same date.

The cause is reversed and remanded with directions to the court below to take an accounting of rents since the delivery of the Nicolds deed to respondent, deducting therefrom any subsequent taxes or insurance paid by respondent, and to render judgment therefor in favor of appellant, and also vesting the title to seventeen and one-half feet off the north side of lot ten in block ten in Excelsior Springs, out of respondent and into appellant, on his payment of $300 with interest into court for the use of respondent.

All concur, except *Marshall, J.,* not sitting.