(No. 12937.—Decree affirmed.)

E. E. KEATING, Plaintiff in Error, *vs.* ARCHIE M. FRINT
*et al.* Defendants in Error.

*Opinion filed February 18, 1920.*

1. SPECIFIC PERFORMANCE—*it is not necessary to show fraud to
defeat suit for specific performance.*  The principles which govern
in a suit for specific performance are different from those in an
action on the case for fraud and deceit, and it is not necessary to
show fraud in the transaction in order to justify the court in deny-
ing specific performance.

2. SAME—*contract must have been entered into without misrep-
resentation, misapprehension or mistake.*  The doctrine that the spe-
cific performance of a contract to convey real estate is ordinarily
as much a matter of course as an action for damages for its breach
is subject to the qualification in equity that the contract must have
been fairly and understandingly entered into, without any circum-
stances of misrepresentation, misapprehension or mistake which
would make its enforcement oppressive or unjust.

3. SAME—*when finding of chancellor will not be reversed.*  The
chancellor who heard the witnesses testify in open court is better
able to determine the credibility and weight to be given the testi-
mony than is a reviewing court, and where a decision depends upon
the credibility of witnesses the finding of the chancellor will not
be reversed unless it is clearly manifest that a palpable error has
been committed.

4. SAME—*when vendor is not entitled to specific performance.*
Where a proposed purchaser of land in Canada acts upon misrep-
resentations of a third party to whom he was referred by the
vendor for information as to the quality and location of the land,
the vendor, although he may not be responsible for the false state-
ments, is not entitled to specific performance, where the consider-
ation agreed upon is grossly unfair in view of the actual value
of the land.

WRIT OF ERROR to the Circuit Court of Boone county;
the Hon. ROBERT K. WELSH, Judge, presiding.

CHARLES W. FERGUSON, for plaintiff in error.

REYNOLDS & RECKHOW, for defendants in error.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The circuit court of Boone county dismissed a bill brought by Edward E. Keating against Archie M. Frint for the specific performance of a contract for the exchange of real estate, and the complainant sued out a writ of error.

Frint owned a farm of 220 acres in Belvidere township, in Boone county, and Keating owned 320 acres in the province of Alberta, Canada. On May 28, 1918, they entered into a written contract for the conveyance by Frint to Keating of his Boone county farm for $1500 cash, a conveyance to him of the 320 acres in Alberta and a trust deed for $20,000 on the Boone county farm. The contract was to be performed within ten days or as soon thereafter as Frint should furnish an abstract showing a good merchantable title. Frint furnished the abstract, and Keating accepted the title as satisfactory within the ten days and has always been ready and willing and has offered to perform all things required of him in accordance with the contract. Frint had never seen the Canada land and knew nothing about it except such information as he received from Keating and from sources to which Keating directed him, and he claims that he was misinformed through the false and fraudulent representations of Keating, and of others to whom Keating directed him, as to the value of the land, its location, the amount under cultivation and the quality and nature of the soil.

Frint acquired the 220-acre farm in 1914 in two parcels at a cost of $27,850. He bought it through John F. Meyers, who was in the real estate business and was also vice-president of the Second National Bank of Belvidere, with which Frint did his banking business. In the spring of 1918 Frint offered to sell the farm to Meyers, but Meyers declined to buy it and advised Frint against selling. Frint

testified that he offered to sell for $36,000 in cash and the amount he owed the bank, which was $2300. Meyers testified that Frint told him he wanted to sell because he wanted to get out of Belvidere, and he would sell if he could get his money back, if he could not do better. Frint did not employ Meyers as his agent to sell the land, but a few days later Meyers told Keating about the farm and at Keating's request went with him in Keating's automobile to Frint's farm, where they found Frint and drove over the farm with him. Keating offered to trade Frint some Minnesota and Canada land, but Frint did not agree and Meyers and Keating left. Soon after Meyers and Frint had an interview at the bank, in which Meyers advised Frint not to trade for both tracts but said he believed Frint could get a pretty fair trade for the Canada land. A day or two later, Meyers, Keating and Frint met by appointment in the evening at Meyers' house. Meyers was soon called away but Keating and Frint remained discussing the trade. Frint asked about the Canada land, and Keating said that he had never seen it but understood it was a good piece of land. Keating testified that at the outset prices had been talked about, and Frint asked $165 an acre for his land and Keating $40 an acre for his, and afterward neither would cut the price. Frint said he wished he could see someone who had seen the land, and asked if Keating knew anyone who had seen it. Keating told him that Keating's brother, and also Charles Corson, of Genoa, whom Frint knew, had seen it, and he thought that Frint could talk with Corson over the telephone. Thereupon Keating called Corson from Meyers' house and Frint talked with him about the land. The next day the written contract for the exchange of the lands was prepared and executed. Before the expiration of the ten days within which the contract was to be performed Frint went to Canada and visited the land for which he had traded. Upon his return, about June 18, he called Keating

on the telephone and afterwards met him and talked with him. Frint told Keating that he would not trade; that the land had been misrepresented to him and he would not accept it.

In regard to the telephone conversation with Corson just before the making of the contract, Frint testified that he asked Corson about the land and Corson told him that it was all good land,—just rolling enough so that the water would run off well; that there was not a stone on it; that 280 acres were broken up, most of which was in crop in 1918, and it was 20 miles from the town of Lethbridge and 8 miles from the town of Warner. Corson testified as to this conversation that he told Frint that the land was a little rolling,—nice rolling land; that there were a few stones in some places, and that it was from 23 to 25 miles from some town the name of which Corson could not remember at the time of the trial, and 7½ or 8 miles from a railroad siding. Frint testified as to what he found when he visited the land after the contract was made; that there were stones nearly all over the land, some of which had been picked up and some not; a pond of 8 or 10 acres; a corner of 5 or 6 acres was so hilly that a horse could not walk straight up; one end of 10 or 15 acres was washy; not nearly the amount represented was broken up or in crop, and it was 25 miles from Warner and 60 miles from Lethbridge. A map of the Lethbridge land district 144 miles long by 108 miles wide, in which district this land was located, was introduced in evidence. It shows the land 7½ or 8 miles from a railroad siding, about 25 miles from Warner and about 60 miles from Lethbridge. The land is in the southeast part of the district. Corson testified that when he examined the land it looked nice,—just a little bit rolling,—and he was told 150 acres were broken up. Corson was on the land in January and there was some snow on the ground. He went about half way across the land and saw pretty well across it but saw no pond, and he tes-

tified that he did not tell Frint that 280 acres were broken
up, but that the tenant told him, and he told Frint, that
160 acres were broken up; that he did not tell Frint that
amount was in crop. There is no testimony as to the
value of the land except that of T. F. Dixon, which is of
slight value because of the insufficiency of his information.
He had been through the north part of the Lethbridge land
district, which is a long distance from the land in question
here. He testified that there is not much difference in the
character of the soil in the entire district. It is a rolling
chocolate clay. When it is loose it blows away with the
wind, and when it is packed nothing can turn it up. He
farmed for three months in the northern part of the dis-
trict and learned the market value of lands there, and in
his opinion their value was $4 an acre. Keating testified
that the tenant on the Canada land (a man by the name of
Baily) offered $20 per acre for the land, which he refused,
and that Keating told Frint of the offer and said he put
the value of the land in the trade at $40 per acre. C. J.
Keating, a brother of the plaintiff in error, had also seen
the land in the spring of 1916, when it was covered by sev-
eral inches of snow. He saw no pond, and, of course, saw
no stones. He crossed half of the land and could see the
balance.

Taking the testimony of Frint, Corson and C. J. Keat-
ing, all of whom had seen the land, it appears that there
were stones on it, several acres were exceedingly rough,
several more washy, about 160 acres were broken for cul-
tivation, and it was about 60 miles from Lethbridge and
25 from Warner. As to these matters Frint claims that
Corson told him in response to his questions that 280 acres
were broken for cultivation, the land was just sufficiently
rolling to make it drain well, there were no stones on it,
and it was 25 miles from Lethbridge and 7½ or 8 miles
from Warner. Corson denies making these statements.
He had at one time been employed by Keating in buying

horses but was not so employed at the time of the conversation with Frint. He had visited the land for Keating, but it does not appear that he was acting on any understanding with Keating in the transaction with Frint.

The representations made by Corson (if the chancellor believed the testimony of Frint) that there were no stones on the land, that 280 acres were broken for cultivation, that it was 25 miles from Lethbridge, that it was just rolling enough to make it drain well and that the land was good land, when in truth and in fact there were stones all over it, not more than 160 acres were broken for cultivation, it was 60 miles from Lethbridge, and parts of it were so hilly and washy as to be useless for cultivation, were material false representations, for which Frint might rightfully have refused to perform the contract had they been made by Keating himself. On the other hand, if Frint, on being informed that Keating knew nothing about the land, had sought information on his own initiative and satisfied himself by his own investigation of the quality and character of the land, Keating could not be held responsible for misinformation so acquired by Frint. Where the material false statements are made by a third party as the result of a conspiracy between the vendor and the third party the vendor is held responsible for such statements. (*Kenner* v. *Harding*, 85 Ill. 264.) It was said there that the purchaser, being "uninformed as to the value of the land, was entitled to expect that he could get honest information from others and was not to anticipate they were in a conspiracy with the defendant to deceive him. By this conspiracy the defendant caused a source of information to which the plaintiff had a right to resort and on which to rely to become corrupted, and thereby prevented his obtaining correct information, and so the plaintiff was both morally and legally defrauded." That was an action on the case for fraud and deceit, in which it was necessary to prove the making of material false representations which were known to be false.

The principles which govern in a suit for specific performance are different from those in an action on the case for deceit. "Specific performance cannot be demanded as a matter of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the particular case. If the contract is unreasonable or unjust or for any other good reason should not be performed a dceree will not be granted." (*Wolf* v. *Lawrence*, 276 Ill. 11.) The doctrine that the specific performance of a contract to convey real estate is ordinarily as much a matter of course as an action of damages for its breach, is subject to the qualification, which always applies in equity, that the contract was fairly and understandingly entered into, without any circumstances of misrepresentation, misapprehension or mistake which would make its enforcement oppressive or unjust. It is not necessary to show fraud to defeat a specific performance, but the rule is as stated in *Frisby* v. *Ballance*, 4 Scam. 287: "An application for the specific performance of a contract is addressed to the sound legal discretion of the court, and it is not a matter of course that it will be decreed because a legal contract is shown to exist. Indeed, the origin and ground of this jurisdiction is that a compensation in damages is inadequate to the full measure of the party's equitable rights. It is not necessary, to authorize this court to refuse a specific performance, that the agreement should be so tainted with fraud as to authorize a decree that it should be given up and canceled on that account. (*Martlock* v. *Buller*, 10 Vesey, *292*; *Willan* v. *Willan*, 16 id. 83; *Jones* v. *Slatham*, 3 Atk. 388.) A specific performance will not be decreed unless the agreement has been entered into with perfect fairness, and without misapprehension, misrepresentation or oppression."

The chancellor heard the witnesses testify in open court. It was necessary for him to determine their credibility and the weight to be given their testimony, and he was much

better able to do so than a reviewing court, with only the record before it. In such a case it is only where it is clearly manifest that a palpable error has been committed that the finding of the chancellor will be reversed. (*Lines* v. *Willey*, 253 Ill. 440.) We see no reason to differ from the conclusions of the chancellor.

The weight of the testimony indicates that Frint's land was worth $35,000. Under the contract he was to receive for it the 320 acres of land and $21,500 in the trust deed and cash. In taking the Canada land at $40 an acre he therefore reduced the $165 an acre which he was asking for his farm $10. He clearly supposed he was getting land of the description which he says he got from Corson, which turned out to be untrue. It may be true that Keating is not liable for damages for the falsity of Corson's statements, but those statements furnished the basis of Frint's trade. Without them it may be inferred that he would not have made the exchange on the terms of the contract. He had been referred by Keating to Corson for information in regard to the subject matter of the contract and had received information which was substantially and materially untrue. He had a right to rely upon the information, for Keating had himself suggested the source and knew that Frint was acting upon it. While Keating may not be liable in damages for Corson's statements, that is not the question, but it is whether Frint is bound by them. He is not trying to hold Keating but Keating is trying to hold Frint. The land is not the kind of land which Frint traded for. There has been a partial failure of the consideration of the exchange. The consideration which would have been adequate had the land been of the quality and description and condition described is inadequate under the actual circumstances. If Keating is not to blame neither is Frint. Why should Keating, because of this misrepresentation, this mistake, this misapprehension, be entitled to put off on Frint his inferior land at the value of such land as Frint supposed,

and was justified in supposing, he would receive? The contract was entered into under a misapprehension of fact and a court of equity will not decree a specific performance.

The decree is affirmed.

*Decree affirmed.*