SIGMUND C. FISH, Appellant, *vs.* CORNELIUS TENINGA *et al.* Appellees.

*Opinion filed April 21, 1928—Rehearing denied June 8, 1928.*

1. TRUSTS—*parol evidence must be clear and convincing to establish a constructive trust.* One claiming the benefit of a constructive trust must establish it by clear and convincing proof, and while such trust may be established by parol evidence, the proof must be clear and convincing and so strong and unmistakable as to lead to but one conclusion.

2. SAME—*when findings of chancellor will not be disturbed.* Where the evidence is conflicting in a suit to establish a constructive trust, the chancellor's findings, based largely on the credibility of the various witnesses, will not be disturbed unless they are clearly against the manifest weight of the testimony.

3. SAME—*what evidence of contract with real estate broker will not support a constructive trust.* A real estate broker whose firm has been negotiating for the purchase of certain property for the firm is not bound to disclose his personal interest in the property to a third person who inquires about its price, and the fact that the third person claims he told the broker to get it for him at the price named does not establish a contract of employment such as will impress a constructive trust upon the property after the brokerage firm completes its negotiations and purchases the property.

4. BROKERS—*a broker is not an agent except by contract.* The business of a real estate broker is not an occupation containing that element of public interest which requires him to deal with everyone, nor does such business impose on a broker an obligation to contract or consult with anyone who may ask him concerning a

transaction in which he is personally interested, but to constitute a broker an agent in any case there must be proof of an employment.

5. SAME—*broker is not required to disclose facts except where agency is established.* A real estate broker is under no duty to disclose material facts known to him regarding property concerning which inquiry is made of him unless the relationship of principal and agent has been established.

DEYOUNG, J., took no part.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

ADLER, LEDERER & KAHN, for appellant.

KIRKLAND, PATTERSON & FLEMING, (JOSEPH B. FLEMING, WILLIAM H. SYMMES, and JOSEPH H. PLECK, of counsel,) for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county dismissing for want of equity appellant's bill to declare a constructive trust. The bill was originally filed against the appellees, Cornelius Teninga and Herman Teninga, his father, and the wives of each. During the pendency of the suit Herman died, and by an amended bill his death was suggested, and his widow, Knelske Teninga, individually, Emma Teninga, wife of Cornelius, and Cornelius and Knelske Teninga, as executors of the estate of Herman Teninga, were made parties defendant. The original bill was filed on February 2, 1922. The hearing was commenced in November, 1926, before the chancellor on the second amended bill, answers and replications thereto.

The amended bill alleges that Christine Hillstrom was the owner of certain real estate situated at 11300-11302 Michigan avenue, in Roseland, in Chicago, Cook county, and that Cornelius Teninga and his father, Herman, as Teninga Bros. & Co., were doing business as real estate brokers in Roseland, and that as such they were holding

330—11

themselves out to buy, sell and deal in real estate for and on behalf of the public upon the usual terms and commissions fixed by the Real Estate Board of Chicago, of which Cornelius was a member; that on January 20, 1922, appellant employed Teninga Bros. & Co., by and through Cornelius, to purchase for appellant said real estate for approximately $50,000, and that Cornelius, on his own behalf and on behalf of the firm of which he was a member, accepted said employment and agreed to negotiate the purchase of the real estate, it being understood and agreed that his firm, as brokers, would earn and be paid the usual and customary fees and charges fixed by the Chicago Real Estate Board; that immediately after such employment, and on the same day, Cornelius negotiated with Oscar Hillstrom, the husband of the owner of the property, who was then acting as her agent to sell the property, and on that day made a contract in writing with the owner of the property for the purchase thereof in his own name and that of Herman for the sum of $50,000; that in negotiating such purchase Cornelius put himself in a position adverse to appellant as principal and fraudulently failed and neglected to disclose to Hillstrom or the owner of the property the name and interest of appellant as such principal, in violation of his duties as a real estate broker; that appellant, relying upon the honesty of purpose and fidelity to his trust of Cornelius to make the purchase for him, made no further effort on his own behalf; that appellant was ready, willing and able to purchase the property upon the terms and conditions contracted for by Cornelius and offered to deposit the purchase price, and proper charges incident thereto, with the clerk of the court; that notwithstanding these transactions Cornelius and Herman procured two warranty deeds bearing date January 20, 1922, and duly recorded in the recorder's office in Cook county on March 22, 1922, conveying an undivided one-half of the property to Cornelius and Emma Teninga, his wife, in joint tenancy, and an undivided one-half of the property to Herman and

Knelske Teninga, his wife, in joint tenancy. The bill prays that the title to the property so held by said four persons in joint tenancy be decreed to be held in trust for the use and benefit of appellant on payment by him of such sum of money as the court may deem just and proper. The answer filed by the defendants admits the relationship of Cornelius and Herman Teninga and their business, and avers that for about a year prior to January 20, 1922, Cornelius and Herman had been negotiating with the owner of the premises for themselves, and on January 19, 1922, Herman had negotiated with Hillstrom to buy the property and that Hillstrom agreed to sell the property to him for $50,000; that on January 20, 1922, a contract was entered into between Hillstrom and Cornelius for the purchase of the property for $50,000, and that the deeds referred to in the bill were executed in accordance with that contract. On a hearing before the chancellor the bill was dismissed for want of equity.

The certificate of evidence is voluminous, containing much that bears only collaterally on the issue involved in the case. It shows that appellant had been an intimate friend of Charles B. Swanson, proprietor of a store diagonally across the street intersection from the property in question. Swanson died, and his estate was being administered and appellant was assisting the widow in so doing. The Swanson stock, together with the good will of the business and a lease on the store where the business was conducted, with an unexpired term of something over two years, was to be sold in the probate court room on January 20, 1922. Cornelius Teninga represented one Morrissey, the owner of the building in which the Swanson store was conducted, and had for some time been negotiating with prospective bidders at the sale to be held of the Swanson stock regarding a lease on the premises, to begin at the expiration of the Swanson lease. The Morrissey property, in which the Swanson store was being conducted at the time of the

death of Swanson under the lease mentioned, was producing
a rental of $450 per month. The evidence shows that in
negotiating with the various bidders for the lease Teninga
requested appellant to convey to the probate judge infor-
mation concerning his attempts to make the lease, so co-
operation might be had to bring a larger return from the
sale of the estate. He testifies that appellant promised that
he would arrange for a conference with the probate judge
on that matter but that he did not do so. A day or two
prior to the sale of the Swanson stock Teninga negotiated
with Paul Soenksen a lease on the Morrissey property oc-
cupied by the Swanson store for a period of ten years, to
commence on the expiration of the existing lease, at a rental
of $1000 per month. On January 20, 1922, the date of the
sale of the Swanson stock, Teninga appeared in the probate
court to confirm the making of the lease. This was the
day following the negotiations between Hillstrom and Her-
man Teninga for the purchase of the Hillstrom property,
which, as we have said, is located diagonally across the
street intersection from the Swanson store. It was evident
to everyone who knew of the lease negotiated with Soenk-
sen that the larger rental to be received, being more than
double what the property had produced, would cause a sharp
rise in real estate values in that neighborhood. While Cor-
nelius was in the probate court room on the morning of
January 20, 1922, he met appellant, and a conversation
took place which appellant contends created a contract be-
tween him and Cornelius by which the latter agreed to pur-
chase the property for appellant. Appellees admit that a
conversation took place but insist that no contract of em-
ployment as broker resulted therefrom. Here lies the crux
of the case. There is a sharp dispute in the evidence as
to what was said between these parties. Appellant tes-
tified that just as Teninga finished his testimony before the
probate judge concerning the lease appellant motioned to
him to come over to talk with him, and they walked toward

the back of the court room. "I asked him what price he could buy the southwest corner of One Hundred and Thirteenth and Michigan, where Klein's furniture store was—what price he could put on that real estate—what he could buy it for, and he replied, 'Around $50,000.' I told him if he could buy that around $50,000 he should buy it for me, and he could go to $55,000 and no more than that. He said, 'All right.' I said: 'When this report goes out of the enormous rent you are getting for the opposite corner, that will increase the value of all the property, and especially the property across the street from this corner. It ought to give a boom to that property.' " He testified that Teninga agreed with him and said he thought that values would increase up there. On cross-examination he testified that there was but very little conversation; that nothing was said between them about commissions to be paid or the rules of the Chicago Real Estate Board; that he at that time did not know when the lease on the premises expired, nor the amount of the rental paid, nor anything concerning the title to the property, nor who held it. When asked about the conversation as to improvements, appellant said he thought they were talked over but "they would not answer our purpose." Later in his cross-examination he said that he did not tell Teninga that the improvements would not answer his purpose but that he told him the improvements would not interest him—that they didn't amount to anything; that he asked Teninga about the valuation of the property; that Teninga tried to tell him what the improvements were; that there was a building on the premises, but that he (appellant) was not interested. Appellant and Teninga agree that there was but one conversation.

William Friedman, an attorney at law who represented appellant in filing the bill but withdrew from the case, testified as a witness. He stated that appellant and Teninga had numerous conversations that day; that they were very confidential; that he several times saw them consulting to-

gether; that he overheard the conversation in question here; that appellant said to Teninga, "What do you think that corner—the northwest corner—is worth?" that Teninga replied, "In the neighborhood of $50,000;" that appellant then said, "I wish you would get that for me for $50,000," or, "Can you get it for me at $50,000 or thereabouts?" that Teninga replied, "Yes, I think I can," whereupon appellant said, "Get it for me if you have to go as high as $55,000; get it;" that Teninga replied, "I think I can get it within those figures." Friedman also testified that nothing was said in the conversation as to terms of payment or the title to the property, its encumbrances or the lease on the premises, and that no conversation was had about commissions. He also stated that the conversation between appellant and Teninga with reference to the purchase of the property took place after two o'clock in the afternoon—after the sale had taken place and the buyer had been announced. Appellant and Teninga testified that the conversation took place before the bidding commenced, Teninga stating that he left the probate court room at about eleven o'clock. Three other witnesses stated that Teninga left before the bidding on the property started. Five additional witnesses stated that they did not see Teninga in the court room after he made his statement to the court. Teninga testified concerning the conversation as follows: "Mr. Fish said, 'What are they asking for that corner across the street—the Klein corner?' I said, 'They are asking around $50,000.' He said, 'Well, find out and let me know, if you can.' Mr. Fish and myself only were present at that conversation. Mr. Friedman was not present at that time." He also testified that as soon as he had the conversation with appellant he left the court room and called his father to learn whether he had closed the deal for the property; that he immediately left the building and took a taxicab and drove to his office in Roseland, got a blank check, and then went to see Hillstrom and closed the deal with him

for the purchase of the property, subject to Hillstrom's wife's approval upon her return from the city. About four or five o'clock that afternoon, after the return of Mrs. Hillstrom, the Hillstroms gave him a written contract for the sale of the property to himself and his father. In his testimony concerning the time of his arrival in Roseland he is corroborated by Arthur J. Zimmerman, who testified that he saw Teninga in front of his office in Roseland between 12:00 and 12:30 on that day, and Hillstrom testified that Teninga's first visit to his office on January 20 was around noon. This has bearing upon the conduct of Teninga during that day and the credibility of the testimony of Friedman that Teninga left the probate court room about 2:30 o'clock.

Appellant also testified that some days prior to the conversation in the court room, and during a conference between himself and Cornelius Teninga at the Harris Trust and Savings Bank concerning the lease on the Morrissey property or Swanson store, he told Teninga that the latter was asking an outrageous rental; that he was considerably incensed about the high rental which Teninga was asking and told him so; that he thought the rent was outrageous, and he wasn't very well pleased over the matter. Teninga testified that appellant's attitude was decidedly hostile in the course of that conversation; that appellant said that the rental was outrageous, and used other adjectives of that sort, saying that Teninga's rental proposition was almost silly, it was so ridiculous. Appellant, however, testified that at the bank on that day he told Teninga that if he ever had any real estate business in Roseland he wanted him to represent him. He testified, however, that he had never had business in Roseland before or since and had never had any other dealings with the Teningas. The chancellor found that this statement, if it was made, was made in a spirit of sarcasm, if not anger. This evidence is of importance as indicating the relations existing between the

parties prior to the conversation in the probate court room. We are satisfied that the chancellor was right in finding that the relations prior thereto had not been friendly.

Appellant stated that he was prepared to pay cash for the property. He stated that he was negotiating for the L. Fish Furniture Company, of which he was president, and also negotiating for himself. He first testified that during the time of these negotiations he was president of the furniture company, later correcting it by stating that he was then vice-president and became president in 1924 or 1925. Appellees offered the reports of the company to the Secretary of State for the years 1921, 1922 and 1923, which, in the recital of names of the company's officers, listed no name as vice-president. Appellees contend that at the time of the conversation on which appellant claims the contract was based, the latter was neither president nor vice-president of the furniture company and had no authority to represent it or to engage the services of a real estate broker for the purchase of property. The record appears to bear out this contention.

Appellant urges as his principal points, (1) that by the conversation in the probate court room between himself and Cornelius Teninga a contract of employment for the purchase of this property arose by which Teninga agreed to purchase the property for him; and (2) that, even if he did not so agree, it was his duty, under all the circumstances, to disclose that he could not accept such employment or would not, and that this duty rested upon him not only because he was a broker but because of a confidential relationship thus established between them.

One claiming the benefit of a constructive trust must establish it by clear and convincing proof. While such trust may be established by parol testimony, the proof must be clear and convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Rubin* v. *Midlinsky,* 321 Ill. 436; *Thanos* v. *Thanos,* 313 id. 499; *Win-*

*kelman* v. *Winkelman,* 307 id. 249.) The proof in this case cannot be said to be clear and convincing. The testimony of Teninga and of Fish is directly contradictory. Friedman's testimony, while affected by that of numerous witnesses concerning his ability to hear the conversation, does not tend to show a definite promise to purchase the property for appellant, but is to the effect that Teninga said that he thought he could get the property for about $50,000, or within $55,000. In proving a contract of this character it must be clearly shown that the minds of the parties met. The prior relations of these parties, evidence of ill-will existing between them, or at least displeasure on the part of appellant with Teninga, together with the sharp contradiction in the testimony as to what conversation took place, justified the chancellor in finding that a contract of employment was not clearly proved. Teninga and his father were at that time negotiating for the property, and it is not at all probable that he would, under those circumstances, accept a brokerage agency to purchase the property for someone else. The evidence does not show the existence of a contract of employment with that clarity essential to cases of this character, and appellant's first point cannot be sustained.

The question then arises on appellant's second point— whether Teninga was under obligation by reason of being a broker, or by reason of circumstances of fiduciary relationship, to inform appellant that he and his father were negotiating for the purchase of this property or to inform him that he could not or would not represent him. What we have said as to the relations of these parties clearly disproves the existence of a fiduciary relationship unless the same existed by reason of a contract, which the chancellor rightly found did not exist. Was it, therefore, Teninga's duty as a broker to inform appellant of his own attempt to secure the property or to say that he could not accept employment? It cannot be said that the business of a real estate broker is an occupation containing that element of pub-

lic interest which requires him to deal with everyone. It is required that there be proof of the existence of an employment to constitute a broker an agent in any case. (*Booker* v. *Booker,* 2c8 Ill. 529; *Schmidt* v. *Shaver,* 196 id. 108; *Hafner* v. *Herron,* 165 id. 242; *Rees* v. *Spruance,* 45 id. 308; *Reeve* v. *Shoemaker,* 205 N. W. (Iowa) 742.) Counsel for appellant have cited the cases hereinafter referred to as sustaining their contention that such duty was imposed upon Teninga. In *Byars* v. *Stubbs,* 85 Ala. 256, Byars, the owner of certain lands, had written to Stubbs asking him to sell for him his interest therein and offered to pay him for his services. Stubbs, instead of entering into an agency agreement, took from Byars an option for himself on the property, and concealed from him facts materially affecting the value of the property which were unknown to Byars. Stubbs filed a bill to secure specific performance of the option contract. The court held that under the facts in the case the contract, by reason of the concealment of facts concerning the property, was unconscionable and denied specific performance on that ground, holding, in effect, that one who avails himself of information ·communicated to him by his prospective principal and suppresses other facts which the principal did not know is not entitled to benefit from the advantage of his knowledge and position, and the court would not enforce on his behalf a contract so secured. *Casey* v. *Casey,* 14 Ill. 112, is also cited. In that case the defendant was managing an estate and secured information of which he later attempted to take advantage to the injury of the estate and for his own gain. That case does not support appellant's contention on the point here involved. *Kochorimbus* v. *Maggos,* 323 Ill. 510, also cited by appellant, is not on all-fours with the facts in this case and can not be said to support the contention that Teninga was required to disclose his interest in the property. The same is true of *Wright* v. *Rankin,* 18 Grant's Ch. (Can.) 625. In that case Rankin, representing both parties to a transaction

for the sale of property, secured the owner's consent to sell for $3500 and then sold to a purchaser for $5600. He did not inform either party of the difference in the price. It was held that as he represented the seller of the property the latter had a right to the difference in the sale price of the land. In *Harrison* v. *Craven,* 88 Mo. 590, 87 S. W. 962, the court found that an agency existed, and that case is therefore not applicable to the case at bar.

It cannot be said that the business of a broker imposes upon one engaged therein an obligation to contract or consult with anyone who may ask him concerning a transaction in which he is personally interested. It is fundamental that all persons be accorded full and equal enjoyment of the right to contract, and unless a situation exists which creates a duty to speak no such duty exists. A real estate broker is under no duty to disclose material facts known to him regarding property concerning which inquiry is made of him unless the relationship of principal and agent has been established. Freund on Police Power, pp. 380, 381; *Cecil* v. *Green,* 161 Ill. 265; *Merryman* v. *David,* 31 id. 404; *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522; *DeWolf* v. *Ford,* 193 N. Y. 397; *Bowlin* v. *Lyon,* 67 Iowa, 536; *Ripy* v. *Cronan,* 131 Ky. 631, 115 S. W. 791.

The chancellor saw and heard the witnesses. The facts were sharply controverted. His findings were based largely upon the credibility of the various witnesses appearing before him. These findings this court will not disturb unless they are clearly against the manifest weight of the testimony. *Keating* v. *Frint,* 291 Ill. 423; *Dalbey* v. *Hayes,* 267 id. 521; *Lines* v. *Willey,* 253 id. 440; *Smith* v. *Brown,* 46 id. 186.

The decree will be affirmed.  *Decree affirmed.*

Mr. JUSTICE DeYOUNG took no part in this decision.